833 So.2d 947 (2002)
Joseph BUJOL, III, et al.
v.
ENTERGY SERVICES, INC., et al.
Don A. PERKINS, et al.
v.
Entergy Services, Inc., et al.
No. 2000 CA 1621.
Court of Appeal of Louisiana, First Circuit.
August 14, 2002.
Opinion on Rehearing January 16, 2003.
Opinion Concurring in Part and Dissenting in Part on Rehearing January 16, 2003.
*954 Donald W. Price, Paul H. Due, B. Scott Andrews, Baton Rouge, Patrick W. Pendley, Plaquemine, David W. Robertson, Dripping Springs, TX, Counsel for Appellees Joseph E. Bujol, III, et al.
Victor L. Marcello, Donald T. Carmouche, John H. Carmouche, Gonzales, Counsel for Appellees Don A. Perkins, et al.
Edward J. Walters, Jr., Darrel J. Papillion, Keith Richards, Baton Rouge, Counsel for Appellees Robert Hracek, et al.
Mark C. Surprenant, Louis C. LaCour, Jr., Robert N. Markle, New Orleans, Counsel for National Union Fire Insurance Company of Pittsburgh, PA.
Michael B. Satz, Chicago, IL, Robert E. Kerrigan, Jr., Joseph L. McReynolds, Marian Mayer Berkett, Thomas E. Schwab, New Orleans, Counsel for X.L. Insurance Company, Ltd.
Before: WHIPPLE, KUHN, GUIDRY, PETTIGREW, JJ., and LANIER,[1] J. Pro Tem.
PETTIGREW, J.
This appeal is from judgments rendered after a second trial arising from an explosion and flash fire. The plaintiffs are two individuals who were severely burned in an industrial accident, Don A. Perkins and Joseph E. "Jeb" Bujol, III, their families, and the survivors of Ray Hracek, who received fatal burns. The defendants in this second jury trial[2] were X.L. Insurance Company, Ltd. (X.L.) and National Union Fire Insurance Company of Pittsburgh, PA (National Union), insurers of Air Liquide, S.A.[3] (ALSA) and Liquid Air *955 Engineering Corporation (LAEC). Judgment was rendered in favor of plaintiffs awarding compensatory and exemplary damages against the insurers.[4] X.L. and National Union perfected this appeal; the Hracek plaintiffs answered the appeal. For the following reasons, we reverse in part, amend in part, affirm in part, and remand to the trial court.

BACKGROUND
On April 6, 1994, three employees who were working at an air-separation plant near Plaquemine, Louisiana, owned and operated by Air Liquide America Corporation (ALAC), were severely injured in an oxygen flash fire. One of those employees, Ray Hracek, died of his injuries several days after the incident. The other two injured employees, Joseph Bujol and Don Perkins, sustained third degree burns over 90 percent of their bodies, but survived. The flash fire occurred approximately three hours after the Plaquemine plant unexpectedly shut down following an electrical disturbance and while the three employees were assisting in restarting the plant.
The workers at the Plaquemine plant were near the end of the task of restarting the plant when an operating problem developed in the "let-down station." An automatic control valve was regulating differential pressures between a 700-pound oxygen pipeline supplying its customer Exxon and a 400-pound pipeline supplying other customers. The plant manager, Mr. Hracek, asked Mr. Bujol and Mr. Perkins to accompany him to the let-down station to address the problem. Mr. Bujol and Mr. Perkins were closing an eight-inch manual isolation valve upstream from the automatic control valve when Mr. Hracek told them to stop. Mr. Hracek climbed inside the loop of piping that formed the let-down station while the other two men watched. They were close enough to the automatic control valve for Mr. Bujol to see it cycle open and then abruptly close. The flash fire immediately erupted.[5]
The record shows that ALSA is a multinational company headquartered in France. In the 1960s, ALSA was distributing pressurized oxygen by pipeline in France and Belgium. In the early 1970s, the company began expanding in Europe. By the time of trial, ALSA's corporate family operated in at least 60 countries, employing 27,600 people worldwide primarily in France and the Americas.
In 1986, Big Three Industries, Inc. (Big Three) was purchased for $1,000,500,000.00 and became part of the ALSA family of companies, adding approximately 15 plants in Louisiana, Mississippi, and Texas to the ALSA list of subsidiaries. A few of these, including the plant at Plaquemine, were air-separation "tonnage" plants. After the acquisition, the air-separation tonnage plants continued to be operated as a separate division of an ALSA subsidiary under the name of Big Three. On January 1, 1994, the Big Three division merged with a sister subsidiary into a new subsidiary, ALAC. Neither the original acquisition nor the subsequent merger affected the physical *956 operation of the Plaquemine plant, which kept the same executives, plant manager, and workers who formerly operated under the Big Three ownership.
ALSA's vice-president for legal and corporate affairs described its structure as "cascading" ownership. ALSA owns Air Liquide International, S.A., which in turn owns American Air Liquide, Inc., which in turn owns AL American Holdings, which in turn owns ALAC. Thus, as the parties describe the relationship, ALSA is the corporate ancestor of ALAC, which is the owner of the Plaquemine plant and employer of the injured men at the time of the accident.
LAEC, an engineering company, was hired in 1990-1991 to build an addition to the Plaquemine plant. Plaintiffs alleged that LAEC failed to investigate the effect that increased capacity would have on the existing facility at Plaquemine. Specifically, plaintiffs averred LAEC failed to ascertain the effect of the plant modification on the automatic control valve that exploded in 1994.
After the accident, ALAC put together a special task force to investigate the accident that ultimately issued what became known as the "Schmidt Report." The report sets forth the following recommendation for the Plaquemine plant: the erection of "[b]arrier walls ... around all oxygen control valve stations in high velocity pressure reducing service. Such walls are to be designed and constructed to withstand the expected forces involved in an oxygen pipeline fire and resulting rupture.... Manual ... valves ... are to be within the barrier wall. Their operating hand wheels must project and be accessible outside the barrier wall."
The recommendation that a barrier wall be erected is consistent with a requirement previously issued by ALSA for its plants in France and for its subsidiaries worldwide. A history of a barrier-wall requirement was adduced at trial through the testimonial and documentary evidence: A series of accidents, beginning with a fatality at a Mons, Belgium plant in 1968, initiated efforts by ALSA, which culminated in the adoption by the European compressed gas industry of a standard calling for the erection of barrier walls for the protection of workers in the industry's plants. ALSA implemented a program of building barrier walls around distribution stations during the mid-1970s. Prior to the accident at the Plaquemine plant, barrier walls were used at ALSA subsidiary plants in Canada and Argentina.

ACTION OF THE TRIAL COURT
Following a jury trial, judgment was rendered in favor of plaintiffs and against the insurers for compensatory and exemplary damages. The jury answered, "Yes" to the following interrogatory: "Do you find that Air Liquide, S.A. [ALSA] assumed a duty for safety at ALAC's Plaquemine Air Separation Plant?" After answering other interrogatories concerning ALSA's liability, the jury found ALSA was 80 percent at fault for the accident, and ALSA's insurers were cast for a percentage of the compensatory damages ultimately awarded in the judgment. The jury also found ALSA liable for exemplary damages. The jury found LAEC to be 15 percent at fault.
The remaining percentage of fault was assessed by the jury against Entergy, which was not a party at the time of this trial. The parties stipulated that Entergy was at fault, but the jury was left to determine the percentage of fault.
National Union and X.L. also challenged coverage under their policies. These issues were decided against the insurers by the trial court.
*957 Additionally, the trial court partially granted a motion for judgment notwithstanding the verdict (JNOV). The court reduced the compensatory damages awarded to Mr. Perkins by $1,000,000.00 and reduced the awards to the Hracek plaintiffs from a total of $8,049,484.00 to $2,999,484.00, which reduction is the subject of their answer to this appeal. The exemplary damage award was correspondingly reallocated.[6]
On appeal, the issues raised by the parties are: prescription, ALSA's liability for compensatory damages, ALSA's liability for exemplary damages, LAEC's liability for compensatory damages, insurance coverage, the JNOV, and set-off.

PRESCRIPTION OF COMPENSATORY DAMAGES
On appeal, National Union and X.L. filed a peremptory exception raising the objection of prescription in addition to challenges of the trial court's failure to grant previously filed exceptions as to prescription urged by both defendants. See La.Code Civ. P. art. 2163. They argue that plaintiffs' claim for compensatory damages has prescribed because National Union and X.L. were not made defendants to this suit until March of 1997, approximately three years after the accident, and there was no timely-sued solidary obligor who interrupted prescription against them. In so contending, they rely on the Louisiana Supreme Court's affirmance of this court's determination that Entergy was not liable to the plaintiffs in Perkins I. See Perkins, 98-2081 (La.App. 1 Cir. 12/28/99), 756 So.2d 388, aff'd, XXXX-XXXX (La.3/23/2001), 782 So.2d 606.
A timely filed suit against one defendant liable in solido with other parties interrupts the running of prescription as to all. Franks v. City of Alexandria, 128 So.2d 310, 314 (La.App. 3 Cir.1961).
It is undisputed that National Union and X.L. were not named in this suit until 1997. Allegedly, our decision in Perkins I removed from the lawsuit one of the timely sued defendants that could have been solidarily liable with ALSA and LAEC, i.e., Entergy. However, National Union and X.L.'s argument must fail for two reasons.
First, prior to submission of this case to the jury, the parties stipulated Entergy's fault, agreeing to leave only the question of the percentage of fault attributable to Entergy to the jury. Therefore, the stipulated facts of this case included that Entergy was at fault in causing the accident. Defendants received a benefit based on the stipulation. Although Entergy was not a party at the time of this trial, any fault assigned to Entergy had the effect of reducing the fault attributed to the other defendants. Thus, defendants derived the benefit of reducing their financial exposure.
Although stipulations cannot affect the powers, duties, and prerogative of the court, generally a stipulation has the effect of a judicial admission that binds the parties and the court when it is not in derogation of the law. Cotton v. Gaylord Container, 96-1958, p. 12 (La.App. 1 Cir. 3/27/97), 691 So.2d 760, 768, writ denied, 97-0800 (La.4/8/97), 693 So.2d 147. Parties are bound by their stipulations regarding factual matters. Id.
The nature of the stipulation in this case is factual. Even though this court and the supreme court concluded that Entergy was *958 not liable in another proceeding that finding is of no moment in this proceeding because the parties stipulated Entergy, a solidary obligor, was liable to plaintiffs thereby interrupting prescription against defendants.
The second reason defendants' assertion that compensatory damages have prescribed fails is because Big Three, another party to this suit, was timely sued in the companion case, Perkins I. The trial court found fault on Big Three's part. That finding, neither appealed nor reversed, establishes the liability of solidary obligor Big Three, effecting interruption of prescription against XL and National Union. See Franks, 128 So.2d at 314.
The exception raising the objection of prescription filed with this court is denied. We find no error in the trial court's determinations concluding plaintiffs' claims for compensatory damages are timely.

ALSA'S LIABILITY FOR COMPENSATORY DAMAGES
Under Louisiana jurisprudence, most negligence cases are resolved by employing a duty/risk analysis. The determination of liability under the duty/risk analysis usually requires proof of five separate elements: (1) proof that the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (2) proof that the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) proof that the defendant had a duty to conform his conduct to a specific standard (the duty element); (4) proof that the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) proof of actual damages (the damages element). Perkins, XXXX-XXXX, XXXX-XXXX, XXXX-XXXX at p. 7, 782 So.2d at 611.[7] If the plaintiff fails to prove any one element by a preponderance of the evidence, the defendant is not liable. Id.
Duty is a question of law; the inquiry is whether the plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed the plaintiff a duty. As a question of law, duty is a legal question subject to de novo review on appeal. Perkins, 98-2081, 98-2082, 98-2083 at p. 22, 756 So.2d at 404.
X.L. and National Union urge on appeal that ALSA did not owe a duty to the employees of its subsidiary, ALAC. There is authority for the proposition that generally a parent corporation has no duty to control the activities of its subsidiary and thus has no liability for a failure to control the actions of its subsidiary. See Joiner v. Ryder System Inc., 966 F.Supp. 1478, 1489-1490 (C.D.Ill.1996), and cases cited therein.[8]
In this case, the issue presented to the jury was not whether ALSA as a parent corporation had a duty of control. The issue was whether ALSA assumed a duty otherwise owed by ALAC to plaintiffs for *959 their safety in the Plaquemine plant. The appellants do not contest this. Indeed, an interrogatory posing this question was submitted to the jury without objection.[9]
Whether ALSA voluntarily assumed a duty to the injured employees at the Plaquemine plant is a factual question to be determined by the fact finder. See Schulker v. Roberson, 91-1228, p. 5 (La. App. 3 Cir. 6/5/96), 676 So.2d 684, 688. As noted in W. PAGE KEETON, ET AL., PROSSER AND KEETON ON THE LAW OF TORTS, § 56 at 379, 385:
This idea of [a] voluntary assumption of a duty by affirmative conduct runs through a variety of cases. Just when the duty is undertaken, when it ends, and what conduct is required, are nowhere clearly defined, and perhaps cannot be....
[S]uch initiation of the "undertaking" is commonly found in minor acts, of no significance in themselves and without any effect of their own upon the plaintiff's interests ....
. . . .
In all such cases where the duty does exist, the obligation is not an absolute one to insure the plaintiff's safety, but requires only that the defendant exercise reasonable care. There is thus no liability when such care has in fact been used, nor where the defendant neither knows nor has reason to foresee the danger or otherwise to know that precautions are called for. [Footnotes omitted.]
Thus, it was appropriate to submit the assumption of a duty issue to the jury for determination. Accordingly, we now examine the jury's decision with the proper standard of review in mind: A court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Theriot v. Lasseigne, 93-2661, p. 5 (La.7/5/94), 640 So.2d 1305, 1310 (citing Sistler v. Liberty Mutual Co., 558 So.2d 1106 (La.1990)). In order to reverse a trial court's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). Further, on review, an appellate court must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099, p. 8 (La.7/5/94), 639 So.2d 216, 221. In sum:
[T]he reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.
Canter v. Koehring Company, 283 So.2d 716, 724 (La.1973).
*960 Thus, we must determine whether the jury in the instant case was manifestly erroneous in determining that ALSA assumed a duty to provide for the safety of the employees at the Plaquemine plant.
We initially note that the plaintiffs' claim of liability against ALSA is based on the RESTATEMENT (SECOND) OF TORTS § 324A (1966), which provides:
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect[10] his undertaking, if
(a) his failure to exercise reasonable care increases the risk of such harm, or
(b) he has undertaken to perform a duty owed by the other to the third person, or
(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.
Section 324A is commonly called the "Good Samaritan doctrine." Johnson v. Abbe Engineering Company, 749 F.2d 1131, 1132 n. 1 (5 Cir.1984).
The concept of an assumed duty is very firmly rooted in Louisiana jurisprudence. Persons or businesses have been held to have assumed a duty in the following factual circumstances: owner of premises assumed task of monitoring job site for violations of its safety standards and was liable to employee of independent contractor injured in a scaffolding accident;[11] a school board that actively participated in and supported a school crossing guard program instituted by city assumed the duty of verifying that the crossing guard would be present during normal duty hours;[12] police jury that voluntarily undertook to work on a bridge it had no custody over created an assumed duty to carry out the work in a reasonably prudent fashion; [13] city employees assumed responsibility for downed power line and were liable for not providing protection until power company workers arrived.[14]
The parties have not cited, and we have not found, any Louisiana cases analyzing the Good Samaritan doctrine in the context of a corporate parent/subsidiary relationship. However, the Supreme Court of Wisconsin in Miller v. Bristol-Myers Company, 168 Wis.2d 863, 485 N.W.2d 31 (1992), addressed the assumption of duty issue in such a context and concluded that pursuant to section 324A of the RESTATEMENT (SECOND) OF TORTS, the parent company had, as a matter of law, assumed a duty of the subsidiary for the safety of its employees. There are striking similarities between Miller and this case.[15] The court noted: "The introductory *961 portion [of section 324A] establishes when an assumption of duty arises. The elements for an assumption of duty to arise are that the actor must: (1) undertake to render services, (2) to another, (3) which such actor should recognize as necessary for the protection of a third person." Miller, 168 Wis.2d at 883, 485 N.W.2d at 38. The court rejected the argument that an assumption of duty cannot arise when the undertaking is intended primarily for the actor's own benefit. The court stated: "In the context of a parent-subsidiary relationship, it would invariably be primarily in the interest of the parent to undertake to render services for the subsidiary because the fortunes of the parent are inextricably linked with the fortunes of the subsidiary." Miller, 168 Wis.2d at 884, 485 N.W.2d at 39. Thus, in the corporate parent/subsidiary relationship, the question is not whether the parent intended to primarily benefit itself, but whether the parent rendered a service to the subsidiary. Id.
In the instant case, the record contains more than ample evidence to conclude the jury was not manifestly erroneous in finding that ALSA had assumed a duty for the safety of ALAC's employees by the issuance of its policy concerning barrier walls. Thus, consistent with section 324A, there is sufficient evidence to find the jury was not manifestly erroneous in determining ALSA had undertaken to share with its subsidiaries its knowledge concerning safety and the safe utilization of barrier walls.
A document central to plaintiffs' case against ALSA is "Technical Instruction 84" (variously referred to as "TI84" or "IT84"). An English translation made by ALSA contemporaneously with the original French version in 1984 was provided to the jury at trial. Although TI84 superceded technical instructions and operating guidelines previously issued by ALSA, the parties do not dispute that TI84 was the technical instruction in place within the ALSA group at the time of plaintiffs' accident. TI84 provides in pertinent part:
Some countries lay down statutory requirements [to ensure the reliability and safety of pipeline networks] and compliance with these is an absolute priority.
In some countries or groups of countries, professional bodies may also lay down guidelines based on common experience in the field and making for better pipeline construction and operation. Such bodies include:
* CGA in the USA and Canada,
* IGC [Industrial Gas Committee] in Europe,
* BCGA in the UK,
* BCI in West Germany,
* SK in Japan.
In early 1983 in Europe, the IGC brought out a document 13/82 entitled THE TRANSPORTATION AND DISTRIBUTION *962 OF OXYGEN BY PIPELINE. It is fairly complete and matches the rules to be respected throughout our Group. In the event of incompatibility with rules in force locally, the DIRECTION TECHNIQUE[16] may be consulted to decide on the attitude to adopt.
IT 84 sets the minimum requirements to be met throughout the AL Group as regards oxygen pipeline networks.
. . . .
3. BASIC RULES

Any person assuming responsibilities in the field of oxygen pipeline networks (design, fabrication, operation or maintenance) should thoroughly familiarize himself with IGC Document 13/82, which provides an exhaustive overview of professional practices, discusses safety problems and explains the reasons underlying rules and procedures.
Throughout the entire construction phase and whenever maintenance is carried out on the pipeline, supervision is necessary to check that components are up to standard and that perfect cleanliness is assured onsite.
. . . .
7. DESIGN AND FABRICATION

Design and fabrication of installations are discussed in Part 4 of Document 13/82. By complying with those recommendations, it is possible to achieve reliable safe pipelines. Technical Notes 33, 34 and 38 contain some additional information on this subject.
The 8-point list below sets out rules, which must be followed for all the Group's pipelines.
. . . .
7.6 Protective walls and screens

Following a number of serious accidents some years ago, we called for the use of a sophisticated system of walls forming protective walls and screens.
Today, less stringent solutions are possible in light of the following factors:
* Experience acquired, especially with networks at 64 bars,
* Confirmation that choice of equipment is correct,
* Installation procedures ensuring high-quality clean installations,
* Analysis of accident since 1970 (when protective wall system was introduced).
For new installations which are up to standard, the only requirement is that operating personnel should be protected during manual opening or closing of gate valves when [they are pressurized].
. . . .
In this case, provision must be made for a protective wall between the gate valve and the handwheel ....
Walls or screens have different protective functions. The measures to be taken in each case are set out below:
a) Protection of operating personnel

As mentioned above, personnel opening or closing gate valves must be adequately protected. This problem may be obviated by using remote control systems.
b) Protection of maintenance personnel

Pipelines should be designed so that maintenance is readily possible after decompression of the sections in question.
The question of regular maintenance checks carried out with the pipeline still pressurized must be examined and strict procedural guidelines laid down. [Emphasis and footnote supplied.]
*963 In addition to the explicit language contained in TI84, which made these standards "requirements" that "must be followed," there was ample testimony at trial from which the jury could conclude that TI84 was a mandatory requirement applicable to ALSA's subsidiaries, including ALAC.
Gerard Campion, who became the safety director for the Air Liquide World Group in 1992, testified that ALSA's Direction Technique was responsible for disseminating the TI84 information to its American subsidiaries. The jury also heard Mr. Campion's deposition testimony, given less than a month prior to trial, that it was the responsibility of the head of the Direction Technique to see that the subsidiary was following ALSA's rules and procedures. Mr. Campion also acknowledged that as the worldwide safety director, he was charged with the responsibility of ensuring that ALSA's safety policy was implemented and that the necessary inspections and safety audits were performed at appropriate intervals.
Another witness who shed light on ALSA's relationship with its subsidiaries was Eric Fortuit. Even in his position as the director of the Direction Technique at the time of the plaintiffs' accident, Mr. Fortuit had no knowledge of the "condition" of the letdown station at the Plaquemine plant prior to the accident. As he did not visit the Plaquemine plant until after the accident, he did not know that protective walls and screens were not in use by Big Three. Mr. Fortuit did know that protective walls were not mentioned in the standards of the CGA, the professional body responsible for setting guidelines for the industry throughout the United States and Canada that was referenced in the TI84 previously quoted. He admitted that all of the ALSA plants in France have protective walls and agreed that protective walls that provided additional safety to plant employees obviously did not violate the standards of the CGA. Mr. Fortuit identified his signature on a document that indicated it was mandatory for the plants in the "AL group" to follow the technical instructions of ALSA. Mr. Fortuit agreed that the document stated the technical safety recommendations were the minimum safety standards of ALSA. Insisting that the instructions were "merely recommendations," Mr. Fortuit stated that it was impossible for ALSA to write technical instructions that would be mandatory in all countries where plants are located because of differences in the working environments. However, Mr. Fortuit acknowledged that the AL group gave information to the subsidiaries and made recommendations in writing for better safety measures. Mr. Fortuit described the function of the Direction Technique as follows:
We write recommendations, and effectively for us it is important to know whether the recommendations were understood. Therefore we make visits to the subsidiaries, we also help the subsidiaries to make the audits of their ... plant, because in the entire function they are responsible to make the audit of their ... own plant.
After the Plaquemine plant accident, ALSA made a "[Recommendation of Technical Safety] for all the subsidiaries, to remind them of the former technical instructions concerning the [barrier] walls...."
A third ALSA executive to testify was Claude Tronchon, who headed the company's engineering and construction activities worldwide from 1986 until 1991. Mr. Tronchon testified as follows: he supervised the American subsidiary, LAEC. He was not responsible for management of LAEC day to day, but the LAEC general manager reported to him. In 1991, Mr. *964 Tronchon became president and chief operating officer of ALAC. In that capacity, he supervised Big Three, ALAC, and at least one Canadian company, CLA. As a shareholder, ALSA could effect a change in operations and procedures at ALAC. If ALSA wanted to impose a particular safety procedure on ALAC, it could do so. In the time frame between 1991 and 1993, ALSA told all the subsidiaries they should have an action plan for all types of accidents. ALSA checked to see that each subsidiary had someone in charge of safety such as a safety coordinator. Mr. Tronchon echoed Mr. Fortuit stating that the local work and safety environment of the plant were the determining factors on whether barrier walls should be utilized.
It was the jury's prerogative to determine if the testimony of the ALSA executives conflicted with the unambiguous wording of TI84.[17] The documentary evidence demonstrates that the references to barrier walls in TI84 were requirements, not recommendations as suggested by ALSA executives. The jury obviously considered this in reaching its verdict. The unrefuted evidence was that ALSA had known for years prior to the fire at the Plaquemine plant that barrier walls would have protected the workers, thus making the plaintiffs' injuries foreseeable. The jury obviously decided the executives' disclaimers of responsibility were inconsistent with the testimony of Mr. Tronchon that ALSA's conduct was "shocking" and the testimony of Mr. Fortuit that such conduct would be "revolting" to a "lay person."
Because of the conflict in the evidence, we cannot find that the jury was manifestly erroneous in concluding ALSA assumed a duty for the safety of the employees at the Plaquemine plant by issuing TI84. As a reviewing court, we must be cautious not to re-weigh the evidence or to substitute our own factual findings simply because we might have decided the case differently. Perkins, XXXX-XXXX, XXXX-XXXX, XXXX-XXXX at p. 9, 782 So.2d at 612. We must rely on the jury's decision-making in accordance with the manifest error standard of review, which is based not only upon the jury's better capacity to evaluate live witnesses (as compared with our access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts. Canter, 283 So.2d at 724.
The evidence satisfies the introductory portion of section 324A of the RESTATEMENT (SECOND) OF TORTS: ALSA undertook to render technical advice and impose requirements on its subsidiaries worldwide, including subsidiary ALAC. ALSA should have, but wantonly failed to, recognize its advice and safety requirements were necessary for the protection of ALAC's employees. As in Miller, 168 Wis.2d at 890, 485 N.W.2d at 41, we conclude the parent corporation assumed a duty owed by the subsidiary to provide a safe workplace.
Having found support in the record for the jury's conclusion that ALSA assumed a duty for safety at ALAC's Plaquemine plant, the remainder of the inquiry required by section 324A of the RESTATEMENT (SECOND) OF TORTS is clearly satisfied by the evidence. The Wisconsin Supreme Court in Miller explained the analysis:
Once an assumption of duty is shown under the introductory portion of section 324A, the remaining portion of the introduction *965 and subsections (a), (b) and (c), establish when liability for assuming such a duty arises. Liability for the actor arises if the actor failed to exercise reasonable care in the undertaking and the requirements of subsections (a), (b) or (c) are met.
Under subsection (a), liability arises where the actor's failure to exercise reasonable care in the undertaking increases the risk of harm to the third person. If a parent corporation unreasonably undertook activities and such activities increased the risk of harm to its subsidiary's employees, and such increase was a cause of the employee's injuries, then the parent corporation would be liable under section 324A(a). However, if it can be shown that the parent corporation exercised reasonable care in undertaking its activities, or the activities did not increase the risk of harm, or the increased risk was not a cause of the employee's injuries, then the parent corporation cannot be held liable under section 324A(a). [Underscoring added.]
Miller, 168 Wis.2d at 884-885, 485 N.W.2d at 39.
The liability of ALSA arose when it assumed the duty of developing and imposing mandatory safety requirements and then failed to exercise reasonable care in disseminating its safety requirements to ALAC and in enforcing its mandatory regulations in the former Big Three plants. We emphasize that ALSA's liability arises not because of a duty to control its subsidiary, but from its failure to enforce its mandatory safety requirements at the Plaquemine plant. ALSA voluntarily assumed a duty owed by ALAC to its employees for their safety.
The argument that safety at the Plaquemine plant was the responsibility of ALAC, not ALSA,[18] is similar to the argument of Bristol-Myers in Miller, which the Wisconsin court rejected as follows:
We do not adopt the supplant-supplement standard because it focuses on the extent of the parent corporation's activity rather than on whether such activity was a cause of the injuries. The issue is not how much the parent corporation did, but rather, whether what it did was a cause of the injuries. It would be inequitable to provide immunity to a parent corporation that had assumed a duty of care to its subsidiary's employees and whose unreasonable performance of its undertaking was a cause of the injuries, simply because its activities were supplemental to, rather than in lieu of, the subsidiary's practices. A parent corporation that assumes a duty to its subsidiary's employees should be held to a standard of reasonable care even if its actions were only supplemental to the subsidiary's practices. [Emphasis added.]
Miller, 168 Wis.2d at 885-886, 485 N.W.2d at 39.
It would be illogical to absolve ALSA of liability merely because ALAC also had a duty to provide a safe workplace for its employees. As proof that ALSA's failure to exercise reasonable care increased the risk to third persons (in this case the ALAC employees), there is substantial testimony of record that the absence of barrier walls substantially contributed to both the nature and extent of the employees' injuries. ALSA executives admitted there had been a fire at a Canadian plant, but because the plant was *966 equipped with a barrier wall, no injuries were sustained. Interestingly, while the United States and Canada are subject to CGA guidelines that do not expressly require erection of barrier walls, that did not prevent the enforcement of the ALSA requirement in Canada.
In sum, we conclude the jury was not manifestly erroneous in determining that ALSA had assumed a duty regarding safety at the ALAC plant when ALSA established mandatory requirements, which included the use of barrier walls. ALSA breached this duty in failing to insure compliance with its mandatory requirements. ALSA has operated oxygen-producing plants for decades. Given this superior knowledge and experience, it was unreasonable of ALSA to fail to insure compliance when the mandatory requirements for barrier walls were already in place. The likelihood and severity of harm that could result were both foreseeable and significant compared to the cost of avoiding the harm. This breach of duty was a cause-in-fact of the injuries suffered by the workers. Thus, the lack of a barrier wall was clearly a substantial factor in bringing about the injuries plaintiffs suffered. The evidence established that barrier walls are designed to prevent the very types of injuries suffered. In the highly volatile environment of oxygen production and transportation, where it was admitted explosions can and do occur in an unpredictable manner, ALSA's substandard conduct in failing to ensure a construction of a barrier wall was a legal cause of the injuries. Consequently, the jury was not manifestly erroneous in determining ALSA was negligent.

PRESCRIPTION OF EXEMPLARY DAMAGES
X.L. and National Union assert the award of exemplary damages is prescribed. X.L. and National Union concede in their memo that co-tortfeasors are deemed solidary obligors for purposes of interrupting prescription as long as they share coextensive liability to repair certain elements of the same damage. In support of this proposal, X.L. and National Union cite James v. Formosa Plastics Corporation of Louisiana, 95-1794 (La.App. 1 Cir. 4/4/96) 672 So.2d 319, writ denied, 96-1091, (La.11/22/96) 683 So.2d 285. In James, this court held that a timely suit against one defendant for compensatory damages did not interrupt prescription as to a late-filed suit against a second defendant for punitive damages, because the second defendant (plaintiff's employer) was not alleged to be responsible for any part of the damages timely sought from the first defendant.
Unlike James, the parties in this case stipulated that Entergy was liable in solido with X.L., National Union, and Big Three for part of the claim and damages urged by the plaintiffs against defendants. This is consistent with the holding of Weber v. Charity Hospital, 475 So.2d 1047, 1051 (La.1985):
[T]wo defendants may be solidarily liable for those damages for which plaintiff can compel either to pay, even though other elements of damages may be recoverable only against one of the defendants.
Therefore, the appellant's argument is without merit, and prescription for the exemplary damages was interrupted when the suits against Entergy and Big Three were timely filed. The argument of X.L. and National Union as to prescription on the issue of exemplary damages is without merit. The exception raising the objection of prescription filed by National Union with this court is denied.

*967 ALSA'S LIABILITY FOR EXEMPLARY DAMAGES
In response to the following interrogatory: "Were the plaintiffs' injuries caused by Air Liquide, S.A.'s [ALSA's] wanton or reckless disregard for public safety in the storage, handling or transportation of a hazardous substance?" the jury answered "Yes." Accordingly, the jury awarded $120,000,000.00 in exemplary damages. On appeal, X.L. and National Union assert the jury was manifestly erroneous in finding that ALSA was liable for exemplary damages within the meaning of repealed La. Civ.Code art. 2315.3. We disagree.
Louisiana Civil Code article 2315.3, which was repealed in 1996,[19] was extant at the time of the accident at the Plaquemine plant. The article provided, in pertinent part:
In addition to general and special damages, exemplary damages may be awarded if it is proved that plaintiff's injuries were caused by the defendant's wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances.
The purpose of Article 2315.3 is threefold: (1) to penalize and punish defendants for engaging in wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances causing injury to others; (2) to deter the tortfeasors and others who might follow their example from exposing the public to dangers of that kind in the future; and (3) to provide victims injured by such conduct with the incentive to act as the prosecutors of penal laws against such wrongdoers. Oubre v. Union Carbide Corporation, 99-63, pp. 22-23 (La. 5 Cir. 12/15/99), 747 So.2d 212, 227, writs denied, XXXX-XXXX, XXXX-XXXX (La.4/20/2000), 760 So.2d 346. Article 2315.3 must be strictly construed, as it imposes a penalty. Chustz v. J.B. Hunt Transport, Inc., 95-0356, p. 2 (La.11/6/95), 662 So.2d 450, 451; In re New Orleans Train Car Leakage Fire Litigation, 95-2710, 95-2721, 95-2734, 95-2797, 95-2811, 96-0015, 96-0016, 96-0017, p. 7 (La.App. 4 Cir. 3/20/96), 671 So.2d 540, 547, writs denied, 96-0972, 96-0977, 96-0978, 96-0984, 96-1287, 96-1311 (La.6/28/96), 675 So.2d 1120, 1121, cert. denied, 519 U.S. 1009, 117 S.Ct. 512, 136 L.Ed.2d 402 (1996).
A review of Article 2315.3 is appropriate.[20] The words of the statute and the cases construing it are clear regarding what is required to "store, handle, or transport" a hazardous or toxic substance. Dumas v. Angus Chemical Company, 31-398, p. 7 (La.App. 2 Cir. 12/9/98), 728 So.2d 434, 438, writ denied, 99-0397 (La.4/9/99), 740 So.2d 631. In interpreting the meaning of these terms, one case found that "storage" refers to the "safe keeping of goods in a depository," "handling" means "to deal with, act on, or dispose of," and "transportation" means "to transfer or convey from one place to another." Id.
In exemplary damages cases arising from hazardous or toxic substances under *968 the article, the courts have not given an overly broad construction to the phrase "storage, handling, [or] transportation." FRANK L. MARAIST & THOMAS C. GALLIGAN, JR., LOUISIANA TORT LAW § 7-3 at 163 (1996).
The evidence produced in this case established that both ALAC and ALSA are in the business of producing, storing, handling, and transporting hazardous substances (i.e., oxygen). ALSA asserts Dumas exonerates it from liability for exemplary damages. In Dumas, 31-398 at pp. 11-12, 728 So.2d at 440, the court held that Glitsch, a manufacturer of processing tanks for nitromethane who was sued following a plant explosion failed to meet the requirements of Art. 2315.3. In so doing, the Dumas court determined that the manufacturer's involvement was merely "in connection with" the storage, handling, or transportation of a hazardous substance, and therefore, it could not be held liable pursuant to Article 2315.3 for exemplary damages.
The Dumas plaintiffs argued that the manufacturer of the tanks continued to be involved with the tanks after their installation because Glitsch had designed a system for processing nitromethane. After the system was installed and in operation, a Glitsch employee visited the plant, observed the operating system, and made improvement suggestions. There was no showing that plant operators were obligated to follow the suggestions made by the manufacturer. The court rejected the argument that, through a visit to the plant by an employee, Glitsch had possession or control, emphasizing that Glitsch had never handled or otherwise dealt with the substance. Dumas, 31-391 at 10, 728 So.2d at 439-440.
Unlike Dumas, both ALAC and ALSA are in the business of storing, handling, or transporting hazardous substances. Unlike the Dumas manufacturer, ALSA affirmatively assumed from ALAC the duty to safely store, handle, or transport the hazardous substance (i.e., oxygen). The evidence here, which the jury relied on to conclude ALSA was liable pursuant to Article 2315.3, was that ALAC was mandated to follow the safety recommendations and procedures placed in operation by ALSA, and that ALSA affirmatively assumed those duties from ALAC. Thus, ALSA stepped into the shoes of ALAC of its own volition. Reading Article 2315.3 in context with La. Civ.Code arts. 2315 and 2316, we note that Article 2315 provides, in part:
Every act whatever of man that causes damage to another obliges him by whom fault it happened to repair it.
Article 2316 provides:
Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his impudence, or his want of skill.
ALSA assumed the duty from ALAC for the safe storage, handling, or transportation of hazardous materials. The evidence made very clear that ALSA knew for years that barrier walls would prevent the injuries sustained by the plaintiffs. ALSA required all of its subsidiaries outside the United States to install barrier walls. ALSA knew or should have known that ALAC had no barrier walls, but unreasonably failed to use care and/or require ALAC to install barrier walls. Negligence is the failure to use the requisite degree of care necessary to avoid a danger that should have been anticipated as likely to cause injury to the plaintiffs. Shally v. New Orleans Public Service and Sewerage and Water Board, 1 La.App. 770 (La.App. 1925), aff'd, 159 La. 519, 105 So. 606. As noted, In re New Orleans Train Car Leakage Fire Litigation, 95-2710, 95-2721, 952734, *969 95-2797, 95-2811, 96-0015, 96-0016, 96-0017, at p. 11, 671 So.2d at 549:
Nothing in the express language of [Article 2315.3] requires a finding that a person or entity be physically involved with the hazardous substance at the time the incident occurs as a prerequisite to liability.
See also, Rivera v. United Gas Pipeline Company, 96-502, 96-503, 97-161, p. 10 (La.App. 5 Cir. 6/30/97), 697 So.2d 327, 336, writs denied, 97-2030, 97-2031, 97-2032, 97-2034 (La.12/12/97), 704 So.2d 1196-1197, wherein the court concluded an agent's negligence can be imputed to its principal.
Whether the plaintiff's injuries were caused by the defendant's wanton or reckless disregard for public safety, another requirement for the imposition of liability pursuant to Article 2315.3, is a factual question answered in the affirmative by the jury in the instant case. After a complete and thorough review of the record, we are convinced that the jury's findings of fact that plaintiffs' injuries were caused by the defendant's wanton and reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances was not manifestly erroneous.
Although defendants introduced evidence to the contrary, the following supports the jury's factual determination: ALSA is a multinational company, headquartered in France. ALSA is in the business of manufacturing, storing, handling, and/or transporting oxygen. At the time of trial, ALSA's corporate families operated in at least 60 countries, employing 27,600 people worldwide (the majority in France and the Americas). ALAC or its ascendant had been part of the ALSA family since 1986.
Following a fatality at a Mons, Belgium plant in 1968, and a subsequent series of accidents, ALSA initiated efforts that culminated in the adoption of a standard requiring the erection of barrier walls in all of its European plants. ALSA implemented a program of building barrier walls around distribution stations during the mid-1970s. Prior to the accident at the Plaquemine plant, barrier walls were used at ALSA's subsidiaries in plants in Canada and Argentina. ALSA did not mandate the installation of barrier walls in its United States plants even though it knew or should have known that its plants lacked this protection. ALSA's own standards and the standards of its subsidiaries required, pursuant to TI84, the erection and use of barrier walls. Mr. Tronchon testified that in 1991 he had become the president and chief operating officer of ALAC. Mr. Tronchon described ALSA's conduct in this regard as "shocking." ALSA executive Mr. Fortuit testified that ALSA's conduct would be "revolting" to a "lay person." These characterizations of conduct made by Mr. Tronchon and Mr. Fortuit obviously assisted the jury in its conclusion that the actions of ALSA were reckless and wanton conduct contemplated in the law. The error assigned by X.L. and National Union is without merit, and the trial court's finding of fact is affirmed.

INTEREST ON EXEMPLARY DAMAGES
X.L. and National Union challenge the trial court's determination awarding legal interest on the exemplary damages from date of judicial demand. Louisiana Revised Statutes 13:4203 provides:
Legal interest shall attach from date of judicial demand on all judgments, sounding in damages, "ex delicto", which may be rendered by any of the courts. *970 "Ex delicto " is defined as "from a delict, tort, fault, crime, or malfeasance." Black's Law Dictionary (6th edition 1990).
In both the civil and the common law, obligations and causes of action are divided in two great classes; those arising ex contractu (out of contract), and those ex delicto, the latter are such as grow out of or founded upon a wrong or tort. King v. New Orleans Ry. and Light Co., 140 La. 843, 845, 74 So. 168, 169 (La.1916).
Award of legal interest in tort cases is not discretionary with the court, as interest attaches automatically until the judgment is paid, whether prayed for in the petition or mentioned in the judgment. Dufrene v. Duncan, 93-0403 p. 5, (La.App. 1 Cir. 3/11/94) 634 So.2d 19, 22. But see Demarest v. Progressive American Insurance Co., 552 So.2d 1329, 1337-39, (La. App. 5 Cir.1989), (holding that prejudgment interest lies on exemplary damage awards under Louisiana law.) Prejudgment interest may not be awarded on claims for punitive damages. Jordan v. Intercontinental Bulk Tank Corp., 621 So.2d 1141, 1158 (La.App. 1 Cir.1993), writ denied, 623 So.2d 1336 (La.1993).
The trial court's award of prejudgment interest on the exemplary damages is reversed. The legal interest on the exemplary damages shall accrue from date of judgment until paid.[21]

LAEC'S LIABILITY FOR COMPENSATORY DAMAGES
A finding of fault must be premised on the existence of a legal duty that was breached. Whether a legal duty is owed by one party to another depends on the facts and circumstances of the case and on the relationship of the parties. Montgomery v. Max Foote Construction Company, 621 So.2d 90, 92 (La.App. 2 Cir.1993). Duty questions, including whether a duty extends to protect a particular plaintiff against a particular harm, are essentially legal questions. Id. The fact that a duty exists does not mean that it extends to protect everyone against every risk all of the time. Id. at 93, (citing Lejeune v. Rayne Branch Hospital, 556 So.2d 559 (La.1990)). Imposition of a duty depends on a case-by-case analysis. Thames v. Ballard, 577 So.2d 149, 151 (La.App. 1 Cir.1991).
As previously mentioned, the basis of the plaintiffs' claims against LAEC, a sister corporation of Big Three, was that LAEC's engineers failed to consider the entirety of the Plaquemine plant before it constructed the new oxygen-producing station (ASU # 4) and increased the production capacity of the Big Three facility at Plaquemine. We find these alleged facts and circumstances do not support the imposition of a duty owed by LAEC to these particular plaintiffs.
A general contractor owes a duty to all workers to make the job site reasonably safe under the circumstances. Lyle v. National Surety Corporation, 304 So.2d 743, 748 (La.App. 3 Cir.1974), writ refused, 309 So.2d 341 (La.1975), cert. denied, 423 U.S. 898, 96 S.Ct. 201, 46 L.Ed.2d 131 (1975). In the instant case, the site of the accident that injured the plaintiffs was removed, *971 both spatially and temporally, from the site where LAEC's work was performed. The explosion occurred in a portion of the plant some distance from where LAEC's work was performed, and over three years after LAEC's work was completed. Thus, LAEC's duty to provide for safety at its job site did not extend to and cover these particular plaintiffs.
Next, we examine whether LAEC, by its contract with Big Three, assumed a duty to provide for the safety of these plaintiffs within the portion of the Plaquemine plant it did not design, construct, alter, or inspect. The pertinent provisions of the contract between Big Three and LAEC, dated January 10, 1990, are:
WHEREAS SELLER [LAEC] wishes to sell and PURCHASER [Big Three] wishes to purchase a 1000 T/D Oxygen Plant [ASU # 4] ... the parties agree as follows:
. . . .
2. SCOPE
2.1 SELLER shall supply PURCHASER with the Plant and shall be responsible for engineering, design, procurement, fabrication, construction, erection and start-up supervision related thereto.
2.2 In order to enable SELLER to fulfill its obligations under this Contract, PURCHASER shall provide or cause to be provided, in a timely manner and at PURCHASER's own cost, all of the equipment and services designated as part of PURCHASER'S scope of supply.
The technical specifications for the oxygen plant are included in the portion of the contract entitled Exhibit "A" providing in pertinent part:

CHAPTER 5.: SCOPE OF SUPPLY
The scope of SELLER's supply will basically consist of the following:
. . . .
ENGINEERING SERVICES
Engineering, Procurement and Project Management
Consultants and Vendor Service Representatives Field Supervision Startup Supervision

EXCLUSIONS (to be furnished by PURCHASER)
Land Acquisition
Clear and Level Site
Access Road to Battery Limits

Oxygen Piping outside Battery Limits
Utilities at Battery Limits

Potable Water
Fire Water
Cooling Water Makeup
34.5 kV Power Supply
Sanitary/Process Sewer
. . . .
5.1 DESCRIPTION OF SERVICES
5.1.1 SELLER'S RESPONSIBILITIES
The SELLER shall perform the following services for the engineering, design, procurement and erection of the Plant:
. . . .
5.1.1.2 Prepare plant layout and tie-in points in consultation with PURCHASER's Project Manager;
. . . .
5.1.2 PURCHASER'S RESPONSIBILITIES
PURCHASER at such times as may be required by SELLER for the successful and continuous prosecution of the work, shall do the *972 following in accordance with the Construction Agreement:
5.1.2.1 Appoint an individual, hereinafter referred to as PURCHASER's Project Manager who shall be authorized to act on behalf of PURCHASER, with whom SELLER may consult at all reasonable times, and, ...whose instructions, requests and decisions will be binding upon PURCHASER as to all matters pertaining to this Project and the performance of the parties hereunder;
5.1.2.2 Consult with SELLER's Project Manager on plant layout and tie-in points, ...
. . . .
5.1.2.6 Provide in-plant roads from battery limits of the oxygen plant to nearest public road;
. . . .
5.1.2.8 Provide necessary permanent utilities, piping, etc. external to the Battery Limits of the oxygen plant;

5.1.2.9 Provide water mains, necessary sewers and storm drainage to the Battery Limits as required;
. . . .
5.14 DESIGN AND MANUFACTURING STANDARDS
5.14.1 The equipment supplied by SELLER will be in general accordance with applicable codes and standards issued by the following organizations:
. . . .
Compressed Gas Association (CGA)
. . . .
5.15 FIELD ERECTION AND CONSTRUCTION
The project scope includes erection of the equipment and facilities furnished by SELLER as described in this document. SELLER shall provide engineering, design and construction management.
. . . .
5.15.1 SITE DEVELOPMENT AND UTILITIES
. . . .
5.15.1.3 Water Supply and Distribution
PURCHASER will provide a source of water supply ... to the Battery Limits, (Italics added.)
The intent of the parties to the contract is expressed in the language quoted above. LAEC assumed responsibility for the project within the "battery limits"; Big Three assumed responsibility outside the "battery limits." The term "battery limits" was defined by Big Three's Project Manager, Julie A. Heil, as a "common term we use to identify the scope of the project. It can be defined [as] ... a breaking point between the role of the supplier which in this case is LAEC, and the customer which would be Big Three." In conformity with the expressions of the contract, she specifically stated that "inside the battery limits" was LAEC's responsibility and "outside the battery limits" was Big Three's responsibility. The plaintiffs' argument that the term "battery limits" is ambiguous and that it can somehow include the portion of the Plaquemine plant already in existence at the time the contract was entered into is incongruous.[22] A fair reading of the contract terms reveals Big Three did not contract with LAEC for engineering services *973 beyond the boundaries of the ASU # 4 plant that LAEC was hired to construct. This interpretation of the contract was verified by further testimony of Ms. Heil:
Q. [D]oes that contract have provisions to allocate responsibility as between [Big Three], on the one hand, and [LAEC], on the other hand, for items, such as this particular let-down valve?
A. Yes. Big Three was responsible for doing that.
Q. What is the general provisions or concept of the contract that would govern this subject?
A. We have battery limits specified in the contract, and we also have exclusions. The pipeline system was excluded from LAEC's scope which would include the let-down-station area.[23]
The term "battery limits" established a parameter for the construction project undertaken by LAEC and the responsibilities retained by Big Three. Accordingly, it cannot be said that LAEC assumed a duty to the plaintiffs to inspect the entire Plaquemine plant.
The plaintiffs' argument, that generally, engineers should consider an entire facility before making an addition, is insufficient to show that LAEC had a duty to these particular plaintiffs under the facts and circumstances of this particular case. See Montgomery, 621 So.2d at 92.
In considering the legal issue of whether LAEC owed these plaintiffs a duty, we find the instant case analogous to the issue of what duty of inspection or examination is required of a contractor when materials are furnished by a proprietor. In Murphy Corporation v. Petrochem Maintenance, Inc., 180 So.2d 716, 722-723 (La.App. 1 Cir.1965), writ refused, 248 La. 910, 182 So.2d 662 (1966), this court stated:
We believe the duty ... extends, in cases where materials are furnished by the owner, to defects which are either patent or discoverable upon ordinary and reasonable inspection by the contractor, due regard being given in each instance to the contractor's greater opportunity to notice or discover defects or, through his superior and technical knowledge, to recognize the suitability of the material. We do not consider that the law makes the contractor the absolute guarantor of the quality of materials furnished by a proprietor. To do so would impose upon the contractor the unconscionable and unreasonable burden of submitting to minute and highly technical test and examination each and every component of any material, device, [or] equipment ... furnished him by the owner for incorporation into a work or project. Such a rule would impose upon the contractor the duty of inspecting for and guarding against any and all latent defects in manufacture as well as any hidden or not reasonably discoverable damage occurring while the material ... is in the possession of the owner preceding installation. Such a harsh, unreasonable and inflexible rule is without support in either our law or jurisprudence and, in our opinion, is to be avoided in the absence of statute expressly so providing.
At no time prior to the accident were the automatic control valve and the letdown station within the Plaquemine plant in the possession, custody, or under the control of LAEC or any of its employees. There was clearly no duty on LAEC to interject itself in the design of the previously *974 built Big Three oxygen-production line.[24]
Because there was no duty, the plaintiffs failed to carry their burden of proof and the jury improperly assessed liability to LAEC. See Cavalier v. Ward, 97-1927, p. 8 (La.App. 1 Cir. 9/25/98), 723 So.2d 480, 484, writ denied, 98-2615 (La.12/11/98), 729 So.2d 1047.

ALLOCATION OF FAULT
Our decision regarding LAEC requires a reassessment of the 15 percent fault the jury assessed to LAEC. In apportioning fault, the court considers the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed. Gibson v. State, Department of Transportation and Development, 95-1418, 95-1419, p. 12 (La.App. 1 Cir. 4/4/96), 674 So.2d 996, 1005, writs denied, 96-1862, 96-1895, 96-1902, (La.10/25/96), 681 So.2d 373, 374. The factors to be considered include: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacity of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste without proper thought. Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 974 (La.1985).
Our review of the record convinces us the 80 percent fault the jury assigned to ALSA was the highest percentage that can be supported by the evidence without being manifestly erroneous. Further, with the jury having been mandated to assess Entergy with some fault pursuant to the parties' stipulation, we find no error in the assessment of 5 percent.
The record is replete with testimony concerning the responsibilities of ALAC, the owner/operator of the Plaquemine plant at the time of the accident. The jury heard testimony that the valve that exploded had been in place for years before the accident, long before Big Three was purchased and became part of the AL group. ALAC, as successor owner/operator of the Plaquemine plant, must be assessed with responsibility for the safety of its workers. The jury was clearly wrong in finding ALAC was without fault. Considering the Watson factors, we increase ALAC's fault from zero to 15 percent, which is the lowest amount the jury could have reasonably allocated to ALAC.

RE-ALLOCATION OF FAULT
Because the accident pre-dated the 1996 amendments to La. Civ.Code arts. 2323 and 2324[25] and ALAC is immune *975 from tort liability as the employer, we must re-allocate the percentage of ALAC's fault to the other two non-immune tortfeasors. The amended version of Article 2324(B), relating to the apportionment of liability for payment of damages, is to be given prospective effect only; when the accident at issue predates the amendments, the matter is controlled by the law in effect at the time of the accident. Fleniken v. Entergy Corporation, XXXX-XXXX, XXXX-XXXX, p. 26 (La.App. 1 Cir. 2/16/01), 780 So.2d 1175, 1193, writs denied, XXXX-XXXX, XXXX-XXXX, XXXX-XXXX (La.6/15/01), 793 So.2d 1250, 1253, 1254 (6/15/01). At the time of the accident in the instant case, the ratio approach of Gauthier v. O'Brien, 618 So.2d 825, 833 (La.1993) was mandated.[26] The ratio approach requires that the judge, after the jury has returned a verdict, disregard the proportion of fault assessed to the employer and proportionately re-allocate fault to all other blameworthy parties. When the plaintiff is not at fault in causing the accident, we must re-allocate fault to the remaining tortfeasors. Fleniken, XXXX-XXXX at p. 26, 780 So.2d at 1193. Because Entergy's fault was 1/16th that of ALSA's, the appropriate ratio is 1 to 16. Thus, fault is re-allocated as follows: Entergy is assessed with 5.94 percent (1/16 of 15 percent plus 5 percent) and ALSA is assessed with 94.06 percent (15/16 of 15 percent plus 80 percent).

INSURANCE COVERAGE
X.L. and National Union argue on appeal that their policies provide no coverage for ALSA[27] for its liability to the plaintiffs.
Following the jury trial in this matter, the trial court judge issued written reasons for judgment, which state, in pertinent part:
The issues presented for decision by the Court in this case primarily involved the existence of coverage under the various insurance policies. Louisiana law provides that where contract language is unambiguous, extrinsic evidence is irrelevant and may not be considered by the Court. La. Civ.Code art. 2046.... Because all of the policies issued to both the Liquid Air companies and the Big Three companies unambiguously state which liabilities they cover, the Court refused to accept into the record any extrinsic evidence on these except by proffer.
Prior to trial, the Court granted summary judgment in favor of plaintiffs, ruling that the policies issued by X.L. in effect on the date of the explosion (Policy XLUMB-00273) and National Union (Policy No. BE XXX-XX-XX) unambiguously provided coverage for the liabilities of ALSA and LAEC. The National Union excess policy provided $25,000,000 in coverage for liabilities in excess of $5,000,000. On April 6, 1994, the X.L. policy provided $70,000,000 in coverage for liabilities in excess of $30,000,000 pursuant to endorsement No. 9, and the plaintiffs acquired a vested right in that coverage on that date.
The trial court then rejected the arguments of the insurers that: 1) the X.L. policy's coverage never attached because the requirement of notice of the loss during *976 the policy period was not satisfied; 2) the National Union policy's endorsement No. 27, which was issued after the accident, excluded coverage for Big Three's operations; 3) "other insurance" clauses in the X.L. and National Union policies excluded coverage because of policies issued by other insurers to Big Three; and 4) the judgment against X.L. and National Union should be reduced because of "coinsurance" provided by other non-party insurers.
We review a judgment determining insurance coverage de novo; appellate courts use the same criteria for these insurance issues as those governing the district court's consideration of whether summary judgment is appropriate. See Schroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342, 345 (La.1991). Where the meaning of a contract is to be determined solely from the words upon its face, without the necessity of extrinsic evidence, the appellate courts are as competent to review the evidence as the trial court, and no special deference is usually accorded the trial court's findings. Id.
An insurance policy is a contract between the insured and the insurer and has the effect of law between the parties. Freyoux v. Estate of Bousegard, 484 So.2d 761, 762 (La.App. 1 Cir.), writ denied, 486 So.2d 753 (La.1986). Because an insurance policy is a contract, the rules established for the construction of written instruments apply to contracts of insurance. Epps v. City of Baton Rouge, 604 So.2d 1336, 1349 (La.App. 1 Cir.1992). Interpretation of an insurance contract is usually a legal question. Dunn v. Potomac Insurance Company of Illinois, 94-2202, p. 6 (La.App. 1 Cir. 6/23/95), 657 So.2d 660, 664. The Louisiana Civil Code defines interpretation of a contract as "the determination of the common intent of the parties." La. Civ.Code art.2045. The intention of the parties is to be determined in accordance with the plain, ordinary, and popular sense of the language used in the agreement and by giving consideration on a practical basis to the instrument in its entirety. Coates v. Northlake Oil Company, Inc., 499 So.2d 252, 255 (La.App. 1 Cir.1986), writ denied, 503 So.2d 476 (La. 1987). Additionally, any ambiguity as to the meaning provided in the provisions is to be interpreted against the insurer as drafter of the contract. La. Civ.Code art. 2056; Livas v. State Farm Mut. Ins. Co., 99-1169, p. 8 (La.App. 1 Cir. 7/18/00), 797 So.2d 694,699.
On appeal, X.L. reiterates its argument that coverage is barred because ALSA did not provide X.L. with notice of the occurrence of the accident within its policy period. X.L. relies on the following policy language:
The X.L. Insurance Company, Ltd.... agrees ... to indemnify the Insured for all sums which the Insured shall be obligated to pay ... for damages on account of 
(1) personal injury ...
resulting from:

Coverage (A): An occurrence (as defined herein), notice of which shall have been given by the Named Insured to the Company prior to the expiration of this Coverage (A) ....
X.L. argues the above language converts its policy from an occurrence policy to an "occurrence-reported" policy; thus, X.L. attempts not only to evade its obligations as the issuer of an occurrence policy,[28] but *977 also to reap the benefits of a claims-made policy while avoiding the limited enforceability of such a policy imposed by the jurisprudence.
The major distinction between an occurrence policy and a claims-made policy encompasses the difference in the peril insured. In an occurrence policy, the peril insured is the occurrence itself. Once the occurrence takes place, coverage attaches even though the claim may not be made for some time thereafter. In a claims-made policy, it is the making of the claim that is the event and peril being insured, regardless of when the occurrence took place. Anderson v. Ichinose, 98-2157, p. 6 (La.9/8/99), 760 So.2d 302, 305, quoting Sol Kroll, The Professional Liability Policy "Claims Made," 13 Forum 842, 843 (1978). In Anderson, the policy was not a pure claims-made policy, but a claims-made-and-reported policy, the purpose of which was to alleviate problems in determining when a claim is made or whether an insured should have known a claim is going to be made.[29]Anderson, 98-2157 at p. 7, 760 So.2d at 306. Regarding the enforcement limitations on a claims-made policy, the court noted:
Several courts have divided on the issue of whether a third party tort victim, who is denied coverage under a claims-made policy because the timely notified insured failed to notify the insurer timely, may resort to the public policy provisions of the Direct Action Statute to obtain coverage, as has sometimes been permitted in similar situations under [an] occurrence policy. See Williams v. Lemaire, 94-1465 (La.App. 4th Cir.5/16/95), 655 So.2d 765, cert. denied, 95-1514 (La.9/22/95), 660 So.2d 481; Murray v. City of Bunkie, 96-297 (La.App. 3d Cir.11/6/96), 686 So.2d 45, cert. denied, 97-0514 (La.5/9/97), 693 So.2d 767; Reichert v. Bertucci, 94-1445 (La.App. 4th Cir.1/31/95), 650 So.2d 821; Resolution Trust Corp. v. Ayo, 31 F.3d 285 (5th Cir.1994). Because [the insured] was not notified of the claim and neither knew nor should have known of the claim during the policy period, we need not discuss whether notice to the insured satisfies the policy requirement of notice to the insurer in the absence of prejudice resulting from the delay in notice.
As stated ..., we leave for another day the question of whether a claims-made insurer may raise, in an action by a victim of the insured's tort, the defense of a non-prejudicial failure of the timely notified insured to give notice to the insurer during the policy period.
Anderson, 98-2157 at pp. 8-9, 760 So.2d at 306-307 nn. 7-8.
In Hedgepeth v. Guerin, 96-1044, p. 12 (La.App. 1 Cir. 3/27/97), 691 So.2d 1355, 1362, writ denied, 97-1377 (La.9/26/97), 701 So.2d 983, this court cited Williams and Murray with approval, noting:

*978 The Direct Action Statute (LSA-R.S.22:655) makes an insurer solidarily liable with the insured to the claimant. The Direct Action Statute also vests the injured party with rights at the time of the tort to institute his action directly against the insurer within the terms and limits of the policy. Under the rationale espoused by the Third and Fourth Circuit Courts of Appeal in Williams v. LeMaire, 655 So.2d at 765 and Murray v. City of Bunkie, 686 So.2d at 45, those rights cannot be taken away from a plaintiff because of the insured's failure to notify the insurera condition over which the injured party had no control. Therefore, those courts have held that, if language in a "claims made" policy between an insurer and its insured requires notice by the insured to the insurer within the policy period thereby defeating an injured party's right to proceed directly against the insurer, that language is against public policy. [Footnote and citations omitted.]
However, the record in Hedgepeth was devoid of any evidence that the injured party provided notice to the insured during the policy period or that the insured failed to communicate the information to the insurer during the policy period; the plaintiffs did not make a claim during the policy period. As such, that case was not decided on the basis of a violation of the Direct Action Statute. Hedgepeth, 96-1044 at pp. 12-13, 691 So.2d at 1363. Instead, this court held the claims-made policy was unenforceable as contrary to the prescriptive period for insurance and medical malpractice actions and the general principles of the Medical Malpractice Act. Hedgepeth, 96-1044 at pp. 14-15, 691 So.2d at 1364.
Based on the jurisprudence and the facts of the instant case, we find the trial court was correct in finding the notice requirement of the X.L. policy was unenforceable.
Claiming that the National Union and X.L. policies specifically exclude coverage for the "operations of Big Three Industries, Inc.," X.L. adopts the arguments on this issue contained in the National Union brief.
In reasons for judgment the trial court rejected the argument that the National Union policy's endorsement No. 27, which was issued after the accident, with an effective date of June 1, 1994, excluded coverage. The court stated:
These endorsements have no effect on the claims of the plaintiffs for several reasons. Plaintiffs['] claims are not based on the operations of Big Three Industries. Rather, these claims are based on the operations of LAEC and ALSA. Big Three Industries had no operations at the time of the flash fire, for the plant was operated by ALAC. Further, [LSA-]R.S. 22:639 specifically prohibits an insurer and an insured from retroactively annulling liability coverage after the occurrence of an injury. Thus, the retroactive endorsement issued by National Union after the flash fire can have no effect on the claims of the plaintiffs.
We agree with the trial court's finding concerning the attempted retroactive endorsement, and we hold that coverage for ALSA is not excluded pursuant to that endorsement.
Thus, we turn to the provisions of the National Union policy in place on the date of the accident to determine the merits of the insurers' assertion that the policies specifically excluded coverage for the operations of Big Three.
The pertinent provisions are found in the "Named Insured Endorsement," which has the effective date of "6/1/93." The *979 named insured is Liquid Air Corporation, the corporation that merged with Big Three on January 1, 1994, to become ALAC, the owner of the Plaquemine plant on the date of the accident. Thus, Liquid Air Corporation, as well as Big Three, had no operations at the Plaquemine plant on the date of the flash fire. However, the endorsement provides for additional named insureds, some of which were in the "cascading" ownership scheme, which begins with ALSA and ends with ALAC. The Named Insured Endorsement reads as follows:
It is agreed that Item 1 of the Declaration, Named Insured, shall read:
Air Liquide International S.A.
American Air Liquide, Inc.
Liquid Air Engineering Corporation/Societe D'Ingenierie Air Liquide
Liquid Air Puerto Rico Corporation
U.S. Divers Co., Inc.
Sea Quest, Inc.
Industrial Gases Distributors in which Liquid Air Corporation has an equity interest
Vitalaire Limited Partnerships
Q-S Oxygen Processes, Inc.
Argonal, Inc.
Hydrogenal, Inc.
Hydrogenal II, Inc.
Medal L.P.
ASGT, Inc.
Canadian Liquid Air
CSI (as ALAC Environmental's interest may appear)
Pro Cal (as LAC[']s interest may appear)
ALAC Environmental Services.[30]
And any past, present or future subsidiary, partnership, affiliated or proprietary organization, provided that any of the aforementioned maintains and/or directly or indirectly, controls a 50% or more ownership interest.

None of the aforementioned are afforded coverage with respect to the operations of [Big Three], Oxychem Canada, Inc. and Aloxy Canada, Inc., with the exception of Liquid Air Corporation plants in which Big Three Industries owns assets.
This policy shall also apply to any claim or claims arising from L'Air Liquide, Societe Anonyme pour L'Etude et L'Explotation des Procedes Georges Claude or Aqualung International or their respective subsidiary or owned or controlled companies only as respects the operations and products of the Named Insured. (Emphasis added.)
ALSA is mentioned only in the final paragraph of the endorsement and not in the list of additional insureds beginning with Air Liquide International S.A. ALSA is not one of the "aforementioned" to which the exclusion of the operations of Big Three was meant to apply. Thus, coverage for ALSA is not excluded by the terms of the second-to-last paragraph of the Named Insured Endorsement in effect on the date of the accident.
X.L. and National Union further argue that the last paragraph of the endorsement, which extends coverage to ALSA, only extends coverage for ALSA's vicarious liability, not for ALSA's independent liability. The pertinent policy provision requires that the plaintiffs' claims "arise out of" ALSA and be "as respects... the Named Insured." The jury's factual *980 finding that ALSA assumed a duty for safety at the Plaquemine plant meets both requirements. ALSA's negligence arose out of its own acts in adopting mandatory technical requirements for its subsidiaries; its failure to impose those requirements on ALAC was an omission "as respects the operations and products" of its subsidiaries, which were named insureds under the policies.
National Union further argues that the "addition of Big Three into the newly-formulated ALAC constituted a `new acquisition' within the meaning of the New Acquisition Endorsement of its policy." We disagree. Big Three was purchased several years before the effective date of this policy, June 1, 1993. Thus, the owner of the Plaquemine plant was not a new acquisition for ALSA. The merger of Big Three and Liquid Air Corporation did not "add" anything to the AL family, as did the previous purchase of Big Three.
Finally, National Union argues that coverage for ALSA is excluded because of the policy exclusion of coverage for professional services. The argument is untenable.
The scenario in the instant case presents the situation where the policy is drafted impermissibly to include one clause that provides coverage and another clause that excludes coverage to the same entity. The courts hold that the two provisions, at the very least, are ambiguous, and that ambiguities are resolved in favor of coverage. See United Services Automobile Association v. Dunn, 598 So.2d 1169, 1170 (La. App. 1 Cir.1992), citing LeJeune v. Allstate Insurance Co., 365 So.2d 471 (La.1978) and Seals v. Morris, 423 So.2d 652 (La. App. 1 Cir.1982), writ granted on other grounds, 433 So.2d 686 (La.1983).
We have already analyzed the paragraph of the Named Insured Endorsement that extends coverage to ALSA for its own acts "as respects" its subsidiaries. ALSA is not just an investor; it is in the business of producing oxygen in its own plants in France and owns numerous subsidiaries throughout the world. All of ALSA's business is of a technical nature. If we were to construe National Union's professional services exclusion as applicable to ALSA's failure to promulgate and enforce its technical requirements to ALAC, we would obliterate coverage for all of ALSA's dealings with its subsidiaries. Exclusions are exceptions to coverage. They cannot be so broad that they extinguish any possible claim. See Justice Watson's dissent in McCarthy v. Berman, 95-1456, p. 3 (La.2/28/96), 668 So.2d 721, 727.
Furthermore, we do not find that the basis of ALSA's liability in this case falls within the purview of its "professional" services.[31] The trial court instructed the jury concerning ordinary negligence, not breach of a standard of care applicable to professionals. There is no support in the record for a conclusion that the jury found ALSA at fault in causing the plaintiffs' damages because of a flaw in its professional services.[32]Accord, Tyler *981 v. Touro Infirmary, 254 La. 204, 218, 223 So.2d 148, 153 (1969),[33] where the court held the failure of the defendant hospital's surgical nurses to properly count sponges during surgery did not constitute "service of a professional nature" within the meaning of a "Malpractice and Professional Services" exclusion in the hospital's general liability policy; therefore, the policy provided coverage for the patient's injuries. In determining whether a particular act or failure to act is of a professional nature, the court should look, not to the title or the character of the party performing the act, but to the act itself. Id., 254 La. at 216, 223 So.2d at 152.
Thus, despite X.L.'s and National Union's numerous assertions to the contrary, the trial court correctly determined there was coverage for ALSA's liability to the plaintiffs under both of their policies.
X.L. also argues that the trial court improperly determined and stacked X.L.'s policy limits. We disagree.
The relevant endorsements plainly indicate that both of the policy limits were in effect on April 6, 1994. At trial, Diana Downs, assistant vice-president of X.L.'s underwriting department, admitted that each layer of coverage was available for an occurrence on April 6, 1994, provided (according to her) that notice was timely given. The failure of the X.L. policy to designate that one policy limit or the other, rather than both limits, applied in this case offers no basis for allowing X.L. to arbitrarily choose its preferred coverage limit. We therefore affirm the trial court's casting X.L. in judgment under both limits to the extent of its insured's liability.
Insofar as quantum of exemplary damages, no party has appealed the quantum of exemplary damages rendered by the jury; therefore, it is not an issue for appeal and is affirmed.

JUDGMENT NOTWITHSTANDING THE VERDICT
The Hracek plaintiffs answered the defendants' appeal and urge this court to reinstate the awards made by the jury for the death of their father. The jury awarded $1,000,000.00 to each of Mr. Hracek's three sons for the wrongful death action and awarded $5,049,484.27 for the survival action. Following the specific interrogatory as to Mr. Hracek's damages, the jury broke down the award as follows: for medical expenses, $49,484.27; for pre-death pain and suffering, $3,000,000.00; and for pre-death mental anguish, $2,000,000.00. Upon granting the defendants' motion for JNOV, the trial court reduced the awards to the three sons to $400,000.00 each, and reduced the awards for pain and suffering and mental anguish to $875,000.00 each, for a total of $1,750,000.00.
A motion for a JNOV may be granted on the issue of liability or damages or both. La.Code Civ. P. art. 1811(F). A JNOV should be granted only if the trial court, after considering all of the evidence in the light most favorable to the party opposing the motion, finds that it points so strongly in favor of the moving party that reasonable persons could not arrive at a contrary verdict on the issue. Barnes v. Thames, 578 So.2d 1155, 1168 (La.App. 1 Cir.), writs denied, 577 So.2d 1009 (La.1991). A JNOV should not be granted where there is a mere preponderance *982 of the evidence in favor of the mover; if the evidence opposed to the motion is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions, the motion should be denied. Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, 832 (La.1991). A JNOV is proper only where the trial judge concludes the verdict is one reasonable people could not have reached. Id. In applying this standard, the trial court cannot weigh the evidence, pass on the credibility of the witnesses, or substitute its judgment of the facts for that of the jury. Barnes, 578 So.2d at 1169.
A JNOV is a procedurally correct device for altering the amount of an unreasonable damage award. When a trial court determines a JNOV is warranted because reasonable persons could not differ that the award was abusively high or low, it must determine the proper amount of damages. See Daigle v. United States Fidelity and Guaranty Insurance Company, 94-0304, pp. 5-6 (La.App. 1 Cir. 5/5/95), 655 So.2d 431, 436. In making this determination, the trial court is not bound by the constraints imposed on appellate courts in Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1976), of lowering the award to the highest point or raising the award to the lowest point reasonably within the discretion afforded that court. Instead, the trial court should render a de novo award based on its independent assessment of damages. See Anderson, 583 So.2d at 833-834.
The standard of review of a JNOV on appeal is twofold. First, we must determine whether the trial court correctly granted the JNOV. To make this determination, we must, after considering all of the evidence in the light most favorable to the party opposing the motion, find that it points so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict on the issue. Barnes, 578 So.2d at 1168. If the verdict is not supported by competent evidence and is wholly unreasonable, then the trial judge is correct in setting it aside. See Daigle, 94-0304 at p. 6, 655 So.2d at 436.
Second, in determining whether the trial court erred in granting the JNOV as to quantum, the appellate court uses the manifest error standard of review. If there was no manifest error, then the trial court's damages award based on its independent assessment of the damages is reviewed on appeal under the constraints of Coco, 341 So.2d 332; i.e., the abuse of discretion standard of review. See Daigle, 94-0304 at p. 7, 655 So.2d at 436.
Applying the above standards, we first address the jury's award for the survival action. Factors to be considered by a jury exercising its discretion in awarding damages for pain and suffering in a survival action are the severity and the duration thereof. Hampton v. Rubicon Chemicals, Inc., 579 So.2d 458, 469 (La.App. 1 Cir. 1991). Different considerations are called for in determining "general damages," which involve not only mental and physical pain, but also inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle, which cannot be measured definitively in terms of money.[34]See Boudreaux v. Farmer, 604 So.2d 641, 654 (La.App. 1 Cir.), writs denied, 605 So.2d 1373, 1374 (La.1992).
*983 The evidence concerning Mr. Hracek's medical expenses, physical pain and suffering, and mental anguish was uncontroverted. Thus, in our review of the JNOV, we conclude the jury verdict granting recovery for those damages was supported by competent evidence. However, the wholly unreasonable amount of the award is readily apparent when it is compared to the jury's awards to the two survivors of the explosion. All three men were horrifically burned in the explosion.[35] However, the record reveals that Mr. Hracek lived for six days following the accident, while Mr. Bujol and Mr. Perkins underwent prolonged hospitalization and treatment thereafter. The extent of the treatment received by the men was not only adduced in the testimony at trial, but is reflected in the amounts of medical expenses each incurred. Mr. Hracek's medical expenses were $49,484.27, while the expenses for Mr. Perkins totaled $955,286.50 and for Mr. Bujol, $1,267,129.53.
Despite the significant differences in the extent of the treatments the men received and the periods of time during which they endured extreme pain and suffering, the jury made the following awards. The jury awarded the Hracek plaintiffs $3,000,000.00 for his pre-death pain and suffering, but awarded both Mr. Bujol and Mr. Perkins $2,000,000.00 for physical pain and suffering. Similarly, the jury awarded the Hracek plaintiffs $2,000,000.00 for his pre-death mental anguish and awarded Mr. Perkins an equal amount, but awarded Mr. Bujol $1,000,000.00 for mental anguish.
We conclude, as apparently the trial court did, that reasonable persons could not differ that the award for the Hracek survival action was abusively high. See Daigle, 94-0304 at pp. 5-6, 655 So.2d at 436. Thus, we find no manifest error in reducing the award for the survival action.
Likewise, our review of the record shows the trial court was also justified in granting a JNOV to reduce the awards to Mr. Hracek's sons for the wrongful death of their father. The elements of damage for a wrongful death action are loss of love, affection, companionship, and support and funeral expenses. Hampton v. Rubicon Chemicals, Inc., 579 So.2d at 469. Attempts to measure in money such intangibles as grief, loss of love and affection, and loss of companionship are subjective and discretionary. Comberrel v. Basford, 550 So.2d 1356, 1362 (La.App. 5 Cir.1989), writs denied, 556 So.2d 1284, 1285, 1286 (La.1990). No one questions the love, affection, and companionship enjoyed by the Hracek family. Despite the evidence that the Hracek family was close-knit, $1,000,000.00 to each son is unsupportable in light of the fact that these three adults were not members of their father's household or dependent upon him for support. When considering a wrongful death award for loss of love, affection and companionship, this court has noted the ranges of such awards in similar cases. See Bell v. Ayio, 97-0534, p. 12 (La.App. 1 Cir. 11/13/98), 731 So.2d 893, 902, writ denied, 98-3115 (La.2/5/99), 738 So.2d 7, and cases cited therein. This court has approved an award to an adult *984 child of $100,000.00 and $225,000.00 for the loss of his father and mother, respectively; each of his five minor siblings received $225,000.00 and $300,000.00 for the loss of their father and mother, respectively. Ly v. State, Department of Public Safety and Corrections, 633 So.2d 197, 206 (La.App. 1 Cir.1993), writ denied, 93-3134 (La.2/25/94), 634 So.2d 835.
Our analysis ends with a determination of whether the trial court's damages awards based on its independent assessment of the damages should be raised under the constraints of Coco. In light of our discussion concerning the disproportionate awards made by the jury, we find the amounts awarded pursuant to the JNOV are not an abuse of the trial court's much discretion.[36] Therefore, we will not disturb the trial court's judgment.

SET-OFF
As an alternative to its argument that the judgments against it should be reversed, X.L. urges us to order a set-off of $34,500,000.00 of the judgment in favor of the plaintiffs because of plaintiffs' settlement for that amount with Big Three and the plaintiffs' assignment to Big Three of "first dollar recovery" in this suit. X.L. bases this argument on the fact that, as assignee, Big Three has filed its own demand against X.L. and National Union in Perkins I, which demand is still pending.
X.L. has cited no authority for the proposition that it is entitled to a set-off of any amount of the judgment in the instant case and has made no showing that a set-off is appropriate under the facts and circumstances of the instant case. See Crayton v. Sentry Insurance Company, 612 So.2d 767, 773, (La.App. 1 Cir.), writs denied, 614 So.2d 83-84 (La.1983). There is no merit to X.L.'s claim of entitlement to a set-off based on this appeal.

CONCLUSION
For the above stated reasons, we reverse the portion of the judgments finding Liquid Air Engineering Corporation liable for compensatory damages and exemplary damages. We affirm the awards of compensatory and exemplary damages to Perkins, Bujol, and to the Hracek plaintiffs as amended by the August 9, 1999 judgment, with the exception of casting the defendants for 94.06 percent of the compensatory damages instead of 95 percent; we affirm the awards of compensatory and exemplary damages not affected by the amendment, as set forth in the June 22, 1999 judgment, with the exception of casting the defendants for 94.06 percent of the compensatory and exemplary damages instead of 95 percent. The amending award of exemplary damages is to bear interest from date of judgment until paid. We affirm the judgments as amended herein in all other respects. We remand the case to the trial court for calculation of damages and rendition of a written judgment consistent with this opinion and with the relative obligations of the two insurers.
We overrule the exception raising the objection of prescription filed by National Union and X.L. in this court.
The Bujol and Perkins plaintiffs filed a motion to strike portions of the reply briefs of X.L. and National Union and prayed for sanctions against counsel for X.L. This matter was referred to the merits. After careful review of the motion and the arguments of the reply briefs, we simply conclude the language and arguments *985 do not warrant striking of the briefs or sanctions. Thus we deny the motion.
MOTION TO STRIKE AND FOR SANCTIONS DENIED; PRESCRIPTION EXCEPTION OVERRULED; JUDGMENTS REVERSED IN PART, AMENDED IN PART; AFFIRMED IN PART; CASE REMANDED.
LANIER, J., concurs in part and dissents in part and assigns reasons
LANIER, J., concurring in part and dissenting in part.
I dissent from that part of the majority opinion that imposes liability for exemplary (punitive) damages on ALSA; in all other respects, I concur.

LIABILITY OF ALSA FOR EXEMPLARY DAMAGES

The Code Article
La. C.C. art. 2315.3 provided as follows:
In addition to general and special damages, exemplary damages may be awarded, if it is proved that plaintiff's injuries were caused by the defendant's wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances.

Interpretation of Code Articles (Laws)
Some of the rules for the interpretation of a Louisiana Civil Code article, such as Article 2315.3, are found in La. C.C. art. 9 et seq. Article 9 provides as follows:
When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature.
See also La. R.S. 1:4. La. C.C. art. 11 provides, in pertinent part, as follows:
The words of a law must be given their generally prevailing meaning.
See also La. R.S. 1:3. La. C.C. art. 13 provides as follows:
Laws on the same subject matter must be interpreted in reference to each other.
The operative words for the purposes of this dissent are "storage, handling, or transportation". Pursuant to La. C.C. art. 11, the generally prevailing meaning of each of these words must be determined.
The generally prevailing meaning of handle found in BLACK'S LAW DICTIONARY, 716 (6th ed.1990), is "[t]o control, direct, to deal with, to act upon, to perform some function with regard to or to have passed through one's hands." Handle is defined in Webster's II New College Dictionary, 503 (2001) as "[t]o touch, lift, or hold with the hands", "[t]o operate with the hands: MANIPULATE" and "[t]o deal with or have responsibility for: CONDUCT".
The generally prevailing meaning of storage found in BLACK'S LAW DICTIONARY, supra at 1420, is "[s]afekeeping of goods in a warehouse or other depository". Storage is defined in Webster's II New College Dictionary, supra at 1087, as "[t]he act of storing goods" and "[a] space for storing goods".
The generally prevailing meaning of transportation found in BLACK'S LAW DICTIONARY, supra at 1499, is "[t]he movement of goods or persons from one place to another, by a carrier". Transportation is defined in Webster's II New College Dictionary, supra at 1172, as "[t]he act of transporting or the state of being transported". Transport is defined as "[t]o convey from one place to another". See also Dumas v. Angus Chem. Co., 31,398, *986 p. 7 (La.App. 2 Cir. 12/9/98), 728 So.2d 434, 438, writ denied, 99-0397 (La.4/9/99), 740 So.2d 631.
The descriptive nouns[1] "storage, handling, or transportation", and their associated verbs[2] "to store", "to handle", or "to transport", have a common thread: to perform the action involved, a person[3] must have physical (actual) possession of the thing that is the object of the action. The thing (hazardous or toxic substance) that is the object of the action (storing, handling or transporting) must be a movable (and not an immovable) because of the nature of the action. An immovable cannot be stored, handled or transported. In the instant case, the thing in question is the oxygen.
Because this is a civil action, pursuant to La. C.C. art. 13, other civil laws must be referred to for the definition of possession. The general definition of possession is found in La. C.C. art. 3421 as follows:
Possession is the detention or enjoyment of a corporeal thing, movable or immovable, that one holds or exercises by himself or by another who keeps or exercises it in his name.
La. C.C. art. 3425 provides that corporeal possession (actual or physical possession) "is the exercise of physical acts of use, detention, or enjoyment over a thing." (The thing herein is oxygen.) Revision Comment (b) for Article 3425 provides, in pertinent part, that "[c]orporeal possession is that by which one possesses a thing corporeally, for example, by ... using a movable." (Emphasis added.) Corporeal possession of a movable is essential to store, handle or transport it.
La. C.C. art. 3427 provides as follows:
One is presumed to intend to possess as owner unless he began to possess in the name of and for another.
ALAC is presumed to possess the oxygen as owner. There is no evidence that ALAC possessed in the name of and for ALSA. La. C.C. art. 3432 provides as follows:
The intent to retain possession is presumed unless there is clear proof of a contrary intention.
ALAC retained possession of the oxygen and there is no evidence of a contrary intention.[4]
La. C.C. art. 3433 provides as follows:
Possession is lost when the possessor manifests his intention to abandon it or when he is evicted by another by force or usurpation.
La. C.C. art. 3434 provides, in pertinent part, as follows:
The right to possess is lost upon abandonment of possession. In case of eviction, the right to possess is lost if the possessor does not recover possession within a year of the eviction.
There is no evidence that ALAC manifested an intention to abandon, or actually abandoned, the corporeal possession of its *987 plant or oxygen. There is no evidence that ALSA had corporeal possession of ALAC's oxygen or plant.
The operative words of Article 2315.3 are clear and unambiguous. Pursuant to La. C.C. art. 9, they "shall be applied as written". (Emphasis added.)

Strict Construction
The majority correctly observes that an additional rule of interpretation applies in this case: Article 2315.3 must be strictly construed because it imposes a penalty. Thus, determining what constitutes strict construction is essential to determining the legal and factual parameters within which Article 2315.3 applies.
Strict construction does not expand the law by implication or equitable considerations; it limits the application of a law to cases clearly within its letter, spirit and/or reason. Gamburg v. City of Alexandria, 85 So.2d 276, 281 (La.App. 2 Cir.1956). In Subdivision Planning Engineers v. Manor Dev. Corp., 349 So.2d 247, 249 (La. 1977), the Louisiana Supreme Court observed that "[s]tatutes creating civil penalties... are not to be extended by implication." In Albe v. Albe, 97-1042, p. 6 (La. App. 4 Cir. 11/19/97), 703 So.2d 756, 759, writ denied, 97-3048 (La.2/13/98), 709 So.2d 752, the court observed that "[s]trict construction of a penal statute requires that it be interpreted AGAINST imposition of penalty ...." When a law is strictly interpreted, it must not be extended beyond its obvious meaning. Monteville v. Terrebonne Parish Consol. Gov't, 567 So.2d 1097, 1100 (La.1990); Ronald Adams Contractor, Inc. v. State, Dep't of Transp. and Dev., Truck Permit Section, 619 So.2d 1180, 1183 (La.App. 1 Cir.1993).[5]

Operative Facts s

The majority concedes that the air-separation plant where the accident occurred was owned and operated by ALAC. The plant was not owned or operated by ALSA.
ALSA's vice-president for legal and corporate affairs described its structure as "cascading" ownership. ALSA owns Air Liquide International, S.A., which in turn owns American Air Liquide, Inc., which in turn owns AL American Holdings, which in turn owns ALAC. Thus, as the parties describe the relationship, ALSA is the "great-great-grandparent" of ALAC, the owner of the Plaquemine plant and employer of the injured men at the time of the accident.
There is no evidence in the record that ALSA, at any time, had corporeal (actual and/or physical) possession of the oxygen at the ALAC plant. There is no evidence in the record that ALSA stored, handled or transported the oxygen at the ALAC plant.

The Jury's Factual Finding
The jury herein was given the instruction that the "defendant must have been in physical possession or control of the hazardous *988 substances prior to the accident." (Emphasis added.) This is a correct statement of the law interpreting Article 2315.3. There was no objection to this instruction. This instruction is correct because of the clear and unambiguous language of La. C.C. art. 2315.3 and the requirement of strict construction that applies to a provision imposing a penalty. Despite this instruction, in response to the following interrogatory: "Were the plaintiffs' injuries caused by Air Liquide, S.A.'s [ALSA's] wanton or reckless disregard for public safety in the storage, handling or transportation of a hazardous substance?", the jury answered "Yes." The jury's answer to the interrogatory (1) violated the trial judge's instruction and (2) the answer was wrong as a matter of law. When there is no evidence to support a finding of fact, a question of law is presented. Cf. La. C.C.P. art. 966; State v. Tennant, 352 So.2d 629, 631 (La.1977); State in Interest of Cox, 461 So.2d 658, 661-662 (La.App. 1 Cir.1984), writ denied, 464 So.2d 1375 (La. 1985). There is no evidence in the record that ALSA had "physical possession or control of the hazardous substances [oxygen] prior to the accident." The jury verdict on this issue is wrong as a matter of law.

Jurisprudence
In the case of In re New Orleans Train Car Leakage Fire Litigation, (Train Car Litigation), 95-2710, 95-2721, 95-2734, 95-2797, 95-2811, 96-0015, 96-0016, 96-0017 (La.App. 4 Cir. 3/20/96), 671 So.2d 540, 549, writs denied, 96-0972, 96-0984, 96-1287, 96-1311, 96-0977, 96-0978 (La.6/28/96), 675 So.2d 1120-1121, an explosion and fire were caused by a leaking railroad tank car containing butadiene. The owner of the tank car was General American Transportation Corp. (GATC). The Train Car Litigation court, at 95-2710, p. 9, 671 So.2d at 547-548, discussed the liability of GATC under Article 2315.3 as follows:

GATC: GATC was the owner of the tank car, having purchased the tank car from Phillips "as is, where is" in December of 1986. GATC then leased the tank car to Mitsui in February of 1987, and had no contact with the tank car after that date. Further, GATC had no connection with the butadiene cargo the tank was carrying and therefore was not involved in the actual storage, handling, or transportation of the butadiene. Under La. C.C. art. 2315.3 and the interpretive jurisprudence, GATC cannot be liable for exemplary damages and the trial court erred in denying General American's motion for summary judgment on the exemplary damages issue. The trial court judgment is reversed; General American's motion for summary judgment on the issue of exemplary damages is hereby granted. (Emphasis added.)
Phillips Petroleum Co. (Phillips) had owned the tank car and sold it to GATC. The Train Car Litigation court, at 95-2710, p. 9, 671 So.2d at 547, discussed the liability of Phillips under Article 2315.3 as follows:
The jurisprudence interpreting La. C.C. art. 2315.3 requires a finding that the defendant have some possession or control over the hazardous substance prior to the victim's injuries. Because Phillips never had possession or control over the butadiene in the instant case, Phillips was not involved in the "storage, handling, or transportation" of the hazardous substance and cannot be held liable for exemplary damages under C.C. art. 2315.3. It is true that all of the maintenance procedures performed on the tank car involved the gasket which the plaintiffs allege was defective; however, that fact does not bring Phillips *989 under the ambit of La. C.C. art. 2315.3. Accordingly, the trial court erred in denying Phillips' motion for summary judgment on the exemplary damages issue. The trial court judgment is reversed, and the motion for summary judgment on the issue of exemplary damages in favor of Phillips is granted. (Emphasis added.)
See also Strauch v. Gates Rubber Co., 879 F.2d 1282 (5th Cir.1989), cert. denied, 493 U.S. 1045, 110 S.Ct. 841, 107 L.Ed.2d 836 (1990); Galjour v. General American Tank Car Corp., 769 F.Supp. 953 (E.D.La. 1991).

Primary Jurisprudence Cited by the Majority
The majority cites the following quotation from Train Car Litigation, 96-0017 at 11, 671 So.2d at 549, as authority for their holding:
Nothing in the express language of [Article 2315.3] requires a finding that a person or entity be physically involved with the hazardous substance at the time the incident occurs as a prerequisite to liability.
This quotation is taken out of context. The entirety of the discussion of this issue in Train Car Litigation supports the position taken in this dissent; it does not support the position taken by the majority or the proposition for which it is cited.
As previously indicated in this dissent, in Train Car Litigation, GATC was the owner of the tank car that contained the butadiene; this tank car leaked and caught fire. GATC leased the tank car to Mitsui. La. C.C. art. 2668 et seq. Mitsui allowed Polysar to use the tank car to transport Polysar's butadiene as a "business favor". The trial court denied Mitsui's motion for summary judgment on the exemplary damages claim under La. C.C. art. 2315.3. The court of appeal affirmed with the following rationale at 96-0017 at 9-10, 671 So.2d at 547-548:
Mitsui claims that it had nothing to do with the loading or transportation of the butadiene. However, Polysar claims it contracted with and relied upon Mitsui to perform all the steps necessary to transfer the cargo from the ship at Goodhope to its plant in Chattanooga. The bill of lading named Mitsui as shipper.
Mitsui denies Polysar's allegations that it was responsible for the shipment of the butadiene, and claims that it simply assisted Polysar in obtaining transportation for the shipment of butadiene. The chemical was directly offloaded from the ship to the tank car by employees of GATX Terminals, who had previously loaded tank cars on lease to Mitsui with butadiene owned by Mitsui. Mitsui claims it simply asked GATX to offload the butadiene on Polysar's request. Concerning the bill of lading, Mitsui claims it simply used a pre-printed form, and that Mitsui's name should have been crossed out and replaced with Polysar's name.

As indicated by these facts, a material issue concerning who had control over the shipping of the butadiene exists, making summary judgment inappropriate. Mitsui contends that Polysar had control over the entire operation; Polysar alleges that Mitsui had responsibility for handling the entire matter. In light of these conflicting contentions, the trial court judgment denying Mitsui's motion for summary judgment on the issue of exemplary damages is correct. The difference between Mitsui and the defendants discussed above [GATC and Phillips] is that Mitsui may have been involved in a series of events related to the transportation of this particular load of butadiene, while *990 the above defendants never had any connection with the transportation of this butadiene but only had a past relationship with the tank car. (Emphasis added.)
The butadiene was owned by Polysar. The GATX Terminals, Inc. employees loaded the butadiene into the tank car owned by GATC, leased to Mitsui and used by Polysar. After the tank car was loaded, its possession was transferred to Illinois Central for transportation to Jefferson Parish where the possession of the tank car was given to the New Orleans Terminal Company (NOTC). (The opinion does not reflect if Illinois Central transported the tank car containing the butadiene gratuitously or pursuant to an onerous contract.) Illinois Central filed a motion for summary judgment on the exemplary damages issue asserting "it had no involvement with the tank car at the time of the explosion and fire". The trial court denied the motion for summary judgment and the court of appeal affirmed with the following rationale at 96-0017 at 11 and 671 So.2d at 549:
We disagree with this interpretation of La. C.C. art. 2315.3. Nothing in the express language of the statute requires a finding that a person or entity be physically involved with the hazardous substance at the time the incident occurs as a prerequisite to liability. Without question Illinois Central was involved in the series of events related to the transportation of this particular load of butadiene, and therefore could be held liable under for La. C.C. art. 2315.3 exemplary damages, if the plaintiffs can prove that it performed its duties in a wanton and reckless manner. Thus, a genuine issue of material fact concerning Illinois Central's liability under La. C.C. art. 2315.3 exists, making summary judgment inappropriate. (Emphasis added.)
Unlike Illinois Central, ALSA did not transport the oxygen. Unlike Mitsui, ALSA did not lease the ALAC plant. Unlike Polysar, ALSA did not use the ALAC plant or own the oxygen. Unlike GATC, ALSA did not own the ALAC plant.
There were eight (8) appellants in Train Car Litigation: (1) AMF-BRD, the manufacturer of the tank, who had no contact with it after 1966; (2) Phillips, who owned and maintained the tank car and sold it to GATC in 1986; (3) GATC, who owned the tank car and leased it to Mitsui in February of 1987; (4) Mitsui, who loaned the tank car to Polysar in September of 1987; (5) Polysar, who owned the butadiene and wanted it transported; (6) Illinois Central, who transported the butadiene from Good Hope, Louisiana, to Jefferson Parish; (7) NOTC, who transported the tank car from Jefferson Parish to New Orleans; and (8) CSX, who received custody of the tank car in New Orleans. The Tank Car Litigation court held that AMF-BRD, Phillips and GATC were not involved in the storage, handling or transportation of the butadiene (did not have corporeal possession of it), and summary judgment was granted in their favor. The court also ruled that because there were facts indicating that Mitsui, Polysar, Illinois Central, NOTC and CSX were involved in the series of events related to the transportation of this particular load of butadiene, they could possibly be found liable for exemplary damages under Article 2315.3 and affirmed the trial court's summary judgments. All of these defendants either had corporeal possession, or corporeal possession followed by civil possession, of the tank car and its contents during its transportation.
The majority can find no comfort in the Train Car Litigation case.
The majority cites Rivera v. United Gas Pipeline Co., 96-502, 96-503, 97-161, *991 p. 10 (La.App. 5 Cir. 6/30/97), 697 So.2d 327, 336, writs denied, 97-2030, 97-2031, 97-2032, 97-2034 (La.12/12/97), 704 So.2d 1196-1197, for the proposition that "[a]n agent's negligence can be imputed to its principal". Although, under certain circumstances, this may be a correct statement of law, it has no relevance to the facts of this case. Rowell v. Carter Mobile Homes, 500 So.2d 748 (La.1987); Blanchard v. Ogima, 253 La. 34, 215 So.2d 902 (1968). It has neither been asserted nor proven that ALAC was an employee or a mandatary of ALSA.
Initially, it should be noted that the noun agent is a common law word whose Louisiana civil law equivalent is mandatary. A mandate is a nominate contract "by which one person gives power to another to transact for him and in his name, one or several affairs." La. C.C. art. 2985.[6] The parties to a mandate contract are the principal and the mandatary. La. C.C. arts. 2987 and 2988. There was no mandate contract between ALSA and ALAC.
An employment contract is a nominate one called a lease of labor. A lease of labor is a synallagmatic contract based on mutual consent by which one party (employee or servant) gives to the other party (employer or master) his labor (services) at a fixed price. La. C.C. arts. 2669, 2673, 2675 and 2746 et seq.; Hawthorn, Waymouth & Carroll v. Johnson, 611 So.2d 645, 654 (La.App. 1 Cir.1992); Guidry v. Freeman, 555 So.2d 588, 591-593 (La.App. 1 Cir.1989).
In Rivera, the court of appeal found that a juridical person (corporation) was liable because its "servant-agent" violated Article 2315.3. There was no "servant-agent" or "employer-employee" relationship between ALSA and ALAC in the instant case.
The majority can find no comfort in Rivera.

The Holding of the Majority
The trial court judge submitted the following interrogatory to the jury to determine if ALSA was liable for compensatory damages:
Do you find that Air Liquide, S.A. [ALSA] assumed a duty for safety at ALAC's Plaquemine Air Separation Plant?
The jury answered "Yes". The majority discusses the effect of this jury verdict as follows:

The liability of ALSA arose when it assumed the duty of developing and imposing mandatory safety requirements and then failed to exercise reasonable care in disseminating its safety requirements to ALAC and in enforcing its mandatory regulations in the former Big Three plants. We emphasize that ALSA's liability arises not because of a duty to control its subsidiary, but from its failure to enforce its mandatory safety requirements at the Plaquemine plant. ALSA voluntarily assumed a duty owed by ALAC to its employees for their safety. (Emphasis added.)
From the above jury verdict and explanation thereof, the majority extrapolates the following rationale for finding ALSA liable for exemplary damages under Article 2315.3:

ALSA assumed the duty from ALAC for the safe storage, handling, or transportation of hazardous materials. The evidence made very clear that ALSA knew for years that barrier walls would prevent the injuries sustained by the *992 plaintiffs. ALSA required all of its subsidiaries outside the United States to install barrier walls. ALSA knew or should have known that ALAC had no barrier walls, but unreasonably failed to use care and/or require ALAC to install barrier walls. (Emphasis added.)
The error in the majority's rationale is that they equate the assumption of a duty to develop, impose, disseminate and enforce safety rules with the corporeal possession of a thing (ALAC's oxygen). The colloquialism for this type of reasoning is "comparing apples with oranges". Very simply, when ALSA assumed the duty for safety, it did not acquire the physical possession of ALAC's plant or ALAC's oxygen. At the time of the accident, ALAC had the sole corporeal possession of the plant and the oxygen. This factual result is the same under either a strict or general construction of Article 2315.3.
I agree that ALSA assumed a duty to develop, impose, disseminate and enforce safety rules at ALAC's plant. I agree with the majority's observation that "ALAC was mandated to follow the safety recommendations and procedures placed in operation by ALSA". However, immediately after this statement, the majority asserts that "... ALSA affirmatively assumed those duties from ALAC. Thus, ALSA stepped into the shoes of ALAC of its own volition." I do not agree with these statements for several reasons.
As I understand the essence of the above statements, the majority asserts that ALAC was mandated to follow rules imposed on it by ALSA; ALSA assumed a duty to follow the rules it imposed on ALAC; and, because ALSA assumed a duty to follow its own rules that it imposed on ALAC, it stepped into the shoes of ALAC. If the majority is saying that ALSA assumed from ALAC the duty it imposed on ALAC to follow ALSA's own rules, then I do not agree that the record shows this was the legal relationship between ALSA and ALAC.
When ALSA imposed safety rules on ALAC, it did not assume an obligation to take corporeal possession of ALAC's plant and the oxygen produced there. Good Samaritans ordinarily do not acquire corporeal possession of the property of those to whom they give advice or assistance. The plaintiffs went to great lengths to prove no one from ALSA went to the Plaquemine plant to make recommendations concerning the design of the letdown station involved in the explosion. There is no evidence that ALSA had corporeal possession of the plant and/or the oxygen at any time prior to the explosion. When ALSA imposed safety rules on ALAC, it did not assume an obligation to actually store, handle or transport ALAC's oxygen (and it did not do so). ALSA's legal position is analogous to that of any person (federal, state, local government or private) that imposes regulations or rules on another. The person imposing the rules and/or the regulations does not acquire corporeal possession of the property of the person being regulated. To hold otherwise would, in my opinion, be a radical, and possibly catastrophic, change in the law.
There is no evidence that on the day of the explosion, or prior thereto, ALSA had any involvement in a series of events related to the actual handling and/or transportation of the oxygen that caused the explosion. ALSA's legal position in this case under Article 2315.3 is the same as that of AMF-BRD, Phillips and GATC in the Train Car Litigation case.
Under the jurisprudence interpreting Article 2315.3, for a person to be liable for exemplary damages, that person must have either corporeal possession of the thing or civil possession preceded by corporeal *993 possession. La. C.C. art. 3431;[7]Dumas; Train Car Litigation; Strauch; Galjour. Accordingly, corporeal (actual or physical) possession is essential to recovery under Article 2315.3. There was no corporeal possession by ALSA in this case. It is a legal fiction to hold that when ALSA assumed the duty to develop, impose, disseminate and enforce safety rules for ALAC, it (ALSA) also acquired the corporeal possession of ALAC's plant and oxygen. This holding by the majority (1) does not limit the application of Article 2315.3 to cases clearly within its language; (2) expands the meaning of Article 2315.3 by implication; and (3) extends its application beyond its obvious meaning. This violates the rule of strict construction. The majority has given lip service to the strict construction rule and the civil code rules for statutory interpretation. To reach a desired result, the majority has liberally interpreted Article 2315.3 to equate assumption of a duty with the acquisition of corporeal possession. I do not agree with this methodology.

RECAPITULATION
The majority's affirmance of the exemplary damage award against ALSA is in error because (1) it affirms a jury verdict that is wrong as a matter of law; (2) it fails to properly interpret La. C.C. art. 2315.3 pursuant to the applicable rules of statutory construction; and (3) it liberally interprets a penal statute to reach its result.

CONCLUSION
For the foregoing reasons, I respectfully dissent from the holding that ALSA is liable for exemplary damages.

ON REHEARING
PER CURIAM.
This court's earlier decision was rendered on August 14, 2002. On August 28, 2002, defendants, X.L. Insurance Company, Ltd. (X.L.) and National Union Fire Insurance Company of Pittsburgh, PA (National Union), timely filed applications for rehearing and rehearing en banc. These rehearing applications raised several issues, including but not limited to: 1) the imposition of exemplary damages under Civil Code Art. 2315.3; 2) the prescription of compensatory damages; 3) the prescription of exemplary damages; and 4) the distinction between duty of control and duty of safety. These original rehearing applications filed by X.L. and National Union raise no new issues that were not previously addressed and properly resolved in the court's decision of August 14, 2002. For this reason, we deny the applications for rehearing.
However, subsequent to this court's decision of August 14, 2002, the Louisiana Supreme Court handed down a decision germane to the issue of punitive damages under La. Civ.Code art. 2315.3. In Ross v. Conoco, Inc., 02-C-0299 (La.10/15/02), 828 So.2d 546, it held "only parties directly engaged in the storage, handling, or transportation of a hazardous substance, who actually possess or control that substance prior to the plaintiff's injury, may be liable for punitive damages under former art. 2315.3." Ross, 02-C-0299 at pp. 1-2, 828 So.2d at 548.
Pursuant to a motion filed October 16, 2002, this court permitted X.L. to supplement its application for rehearing en banc *994 and address the legal issues raised in the Ross case. Due to the issues raised by the Ross case, this court further directed all other party litigants to file supplemental briefs or oppositions to the application for rehearing. All those interested have done so.
After careful consideration of the record of this case and the supreme court's opinion in the Ross case, we are of the opinion that contrary to the position of X.L. and National Union, our decision of August 14, 2002, is actually supported by, and consistent with, the Ross case. In Ross, the plaintiffs alleged a conspiracy to commit battery by a group of vinyl chloride manufacturers who failed to warn the plaintiffs of the dangers inherent in vinyl chloride. The plaintiffs contended that under Louisiana Civil Code Art. 2324, the defendants' participation in the conspiracy to batter coupled with their failure to warn was sufficient to satisfy the storage, handling, or transportation requirement of Art. 2315.3. Alternatively, the plaintiffs argued that steps in the furtherance of this conspiracy constituted an integral part of the storage, handling, and transportation of the toxic substance. Thus, the plaintiffs claimed that they could rely on the acts of alleged co-conspirators to satisfy the requirements of former Civil Code Art. 2315.3.
The Louisiana Supreme Court rejected this argument and held that only parties directly engaged in the storage, handling, or transportation of a hazardous substance who actually possess or control the substance prior to the plaintiff's injury may be liable for punitive damages under former Art. 23.15.3. Ross, 02-C-0299 at pp. 1-2, 828 So.2d at 548.
The fact situations presented in Ross are significantly different from those of the instant case. There are no allegations of conspiracy in this case, only allegations of actual and/or an assumed duty of storage, handling, or transportation of a hazardous substance pursuant to Civil Code Art. 2315.3.
It should be noted that the defendants failed to object to the interrogatories submitted to the jury. In particular, jury interrogatories nos. 1, 2, and 3 provide the following.
1. Do you find that Air Liquide, S.A. assumed a duty for safety at ALAC's Plaquemine Air Separation Plant?
2. Do you find that Air Liquide, S.A. was negligent, which negligence was a legal cause, as that term has been defined for you, of the injuries suffered by Joseph Bujol, Don Perkins, and Ray Hracek?
3. Were the plaintiffs' injuries caused by Air Liquide, S.A.'s wanton or reckless disregard for public safety in the storage, handling, or transportation of a hazardous substance?
The jury answered, "Yes" to each of these questions.
In addition, the trial court specifically charged the jury as follows:
The plaintiffs must show that the defendants' wanton and reckless conduct occurred in the storage, handling, or transportation of a hazardous substance. The defendant must have been in physical possession or control of the hazardous substance prior to the accident; however, the defendant need not have been in physical control, possession or control of that hazardous substance at the moment the plaintiffs were injured.
Implicit in these findings of fact by the jury and trial judge is that Air Liquide directly engaged in the storage, handling, or transportation of a hazardous substance and actually possessed or controlled the substance prior to the plaintiffs' injuries.
*995 These findings are consistent with the Ross case, and after a thorough review of the record, we affirm our previous decision of August 14, 2002.
For the foregoing reasons and for the reasons originally assigned in our decision of August 14, 2002, we find no merit to the rehearing application filed by defendants, X.L. and National Union. Accordingly, we deny the applications for rehearing and the request for rehearing en banc.
On August 28, 2002, plaintiffs-appellees, Joseph E. Bujol, III, individually, and as administrator of the estates of his minor children, Derek Bujol, Dustin Bujol and Devin Bujol, and Tina Hebert Bujol; Don A. Perkins, individually, and as administrator of the estates of his minor children, Ross Allen Perkins, Brittany Nichole Perkins and Kurt Michael Perkins, and Cynthia E. Perkins, and Howard Mack Hughes; and intervenors-appellees, Robert Hracek, Frank E. Hracek and Eric Ray Hracek (collectively, plaintiffs-appellees), likewise filed a timely request for rehearing. The application requests rehearing "for the sole purpose of amending [this court's] statement in the conclusion of [the] opinion of ... August 14, 2002, ... that the award of exemplary damages against the insurers of Air Liquide, S.A.... [should be] reduced by the percentage of fault assigned and allocated to the Entergy companies."
On review, we agree. As plaintiffs-appellees correctly note, neither the jury's verdict nor the trial court's judgment made such a reduction; and instead, cast Air Liquide with the full amount of exemplary damages awarded. Moreover, such a modification was not requested by X.L. or National Union or briefed by the parties. Further, we conclude that reduction of an award of exemplary damages for fault attributable to other parties would be incorrect under applicable Louisiana law and the facts of this case. See Brumfield v. Guilmino, 93-0366 (La.App. 1 Cir. 3/11/94), 633 So.2d 903, 912, writ denied, 94-0806 (La.5/6/94), 637 So.2d 1056.
Former Louisiana Civil Code article 2315.3 granted the right to seek punitive damages to any person injured by a defendant's wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances. In the stipulation concerning Entergy's liability for compensatory damages, there was no stipulation that Entergy was liable for punitive damages, nor was there any stipulation or evidence that Entergy stored, handled, or transported a hazardous or toxic substance.
To deduct Entergy's stipulated percentage of liability for compensatory damages from ALSA's insurers' liability from punitive damages was legal error on our part. We further note that the jury interrogatories only asked one question regarding punitive damages. This was answered in the affirmative, and applied only to Air Liquide and its insurers. We therefore amend our original decision of August 14, 2002 to delete any deduction for the percentage of fault of Entergy insofar as it applies to ALSA and its insurers for punitive damages, making ALSA and its insurers liable for 100 percent of the punitive damages suffered by the plaintiffs herein. The matter is also remanded for further proceedings consistent with the views expressed in our original opinion as amended herein. In all other respects the applications are denied.
REHEARING APPLICATION OF X.L. AND NATIONAL UNION IS DENIED; REHEARING APPLICATION OF PLAINTIFFS-APPELLEES IS GRANTED FOR THE LIMITED PURPOSE OF AMENDING OUR AUGUST 14, 2002 DECISION; IN ALL OTHER RESPECTS, THE REHEARING APPLICATION *996 OF PLAINTIFFS-APPELLEES IS DENIED.
LANIER, J., concurring in part and dissenting in part.
I dissent from the refusal of the majority to follow the holding of the Louisiana Supreme Court in Ross v. Conoco, Inc., 02-0299 (La.10/15/02), 828 So.2d 546, and the refusal to grant a rehearing on the issue of ALSA's liability for exemplary (punitive) damages. I concur in the denial of a rehearing on the issue of ALSA's liability for compensatory damages.

The Legal Relationships Between ALSA and ALAC
ALSA and ALAC are separate corporations and separate juridical persons. La. C.C. art. 24. As indicated in the majority opinion on original hearing, ALSA does not own stock in ALAC.[1] As indicated in my concurring and dissenting opinion on original hearing, there were no employment or mandate contracts between ALSA and ALAC at the time of the operative facts in this case. Therefore, ALSA is not vicariously liable for the torts of ALAC pursuant to La. C.C. art. 2320. Thus, for ALSA to be liable to the plaintiffs for compensatory or punitive damages, ALSA must owe a duty to the plaintiffs that arises independently from ALAC; the duty must be owed directly by ALSA to the plaintiffs; ALSA owes no duty to the plaintiffs just because it is ALAC's "corporate ancestor".
The following is the essence of the majority's rationale for imposing liability on ALSA for compensatory damages:
The liability of ALSA arose when it assumed the duty of developing and imposing mandatory safety requirements and then failed to exercise reasonable care in disseminating its safety requirements to ALAC and in enforcing its mandatory regulations in the former Big Three plants. We emphasize that ALSA's liability arises not because of a duty to control its subsidiary, but from its failure to enforce its mandatory safety requirements at the Plaquemine plant. ALSA voluntarily assumed a duty owed by ALAC to its employees for their safety. (Emphasis added.)
I agree with this rationale on the issue of ALSA's liability for compensatory damages.

Operative Facts Pertaining to ALSA's Liability for Punitive Damages
The majority opinion on original hearing correctly states the following facts. On April 6, 1994, ALAC owned and operated an air-separation plant. This plant manufactured oxygen that was transported by ALAC's pipelines to its customers. On the above date, the plaintiffs were employees of ALAC. On the date of the accident, the plant was "shut down" because of an "electrical disturbance". The plaintiffs were engaged in helping to restart the plant. They were working on an ALAC pipeline when an oxygen flash fire occurred and seriously injured them.
From the above facts, the following facts must be inferred. ALSA did not own, possess or operate the plant. ALSA did not manufacture the oxygen. ALSA did not own, possess or handle the oxygen or the pipeline in which it was being transported and/or stored at the time of the accident. ALSA did not operate the pipeline that transported the oxygen at the time of the accident. The plaintiffs were not employees of ALSA. ALSA was not directly engaged in the storage, handling, *997 or transportation of the oxygen; ALSA did not actually, physically possess or control the oxygen prior to the plaintiffs' injuries. Obviously, it was ALAC that had actual, physical possession and control of the oxygen prior to the plaintiffs' injuries; ALAC was the only person actually engaged in the storage, handling and transportation of the oxygen. The jury's and the majority's findings to the contrary are based on no evidence and, thus, are wrong as a matter of law.

Effect of the Ross Case on the Majority's Affirmance of ALSA's Liability for Punitive Damages
On October 15, 2002, the Louisiana Supreme Court rendered its decision in Ross v. Conoco, Inc. In their per curiam opinion on rehearing, the majority state, in pertinent part, that "[w]e are of the opinion that ... our decision of August 14, 2002, is actually supported by, and consistent with, the Ross case." The majority reviewed the jury's answers to interrogatories pertaining to punitive damages and stated that "[i]mplicit in these findings of fact by the jury and trial judge is that Air Liguide [ALSA] directly engaged in the storage, handling, or transportation of a hazardous substance and actually possessed or controlled the substance prior to the plaintiffs' injuries." (Emphasis added.) In reaching this conclusion, the majority did not amend their statement of operative facts on original hearing or assert any additional pertinent facts in their per curiam.
In my opinion, the majority's conclusion is factually and legally wrong and in direct conflict with Ross (a unanimous opinion of our Supreme Court).
Initially, it should be noted that the underlying tort for which ALSA has been found liable is described in the majority opinion on original hearing as "its failure to enforce its mandatory safety requirements at the Plaquemine plant." Failure to enforce mandatory safety regulations by ALSA does not constitute the physical storage, handling, or transporting of oxygen by ALSA. In Ross, the underlying torts alleged were battery by, and failure to warn about, vinyl chloride. The Ross plaintiffs did not allege as the underlying tort "a conspiracy to store, handle, or transport vinyl chloride in a wanton or reckless manner." Ross, 02-0299, p. 4, 828 So.2d at 552. At Ross, 02-0299, p. 5, 828 So.2d at 552 appears the following:
For the reasons enunciated by the Williams court, plaintiffs have failed to show to this court how conspiracy to commit battery and to misrepresent fraudulently the harmful effects of vinyl chloride amount to a conspiracy to store, handle, or transport in a wanton or reckless manner the vinyl chloride that injured Ross and Landon. Even if plaintiffs did sufficiently allege a conspiracy to store, handle, or transport wantonly or recklessly the offending vinyl chloride, we find that former Article 2315.3 does not support the imposition of punitive damages against parties based solely on the physical acts of their co-conspirators. (Emphasis added.)
In addition, the Louisiana Supreme Court observed as follows: (1) "punitive damages are assessed against an individual defendant based on his individual culpability, not on the acts of others."; (2) "the plain language of former Article 2315.3 does not indicate that the legislature intended for parties engaged in activities beyond direct storage, handling, or transportation of a hazardous or toxic substance to fall within the ambit of the Article."; (3) "[t]he legislative history of former Article 2315.3 also supports the conclusion that only parties directly engaged in the prohibited conduct are targeted by the statute."; (4) "non-employer defendants who *998 have never had physical contact with the vinyl chloride at issue cannot be assessed punitive damages under former Article 2315.3 based on the acts of storage, handling, or transportation by alleged co-conspirators."; (5) "[s]trict construction of former Article 2315.3 mandates that only those parties who actually stored, handled, or transported the vinyl chloride at issue be held liable for punitive damages."; and (6) "because the non-employer defendants did not have actual possession or control of the vinyl chloride that injured the workers, and did not then handle or otherwise deal with the substance, they cannot be cast with punitive damages based on their actions purportedly `integrally related' to the storage, handling, or transportation of vinyl chloride." (Emphasis added.) Ross, 02-0299, pp. 5, 6, 7, 8 and 10, 828 So.2d at 552, 553, 554, 555, 556 and 557.
In addition, the Ross court adopted, by analogy, the jurisprudence interpreting La. C.C. art. 2315.4 pertaining to punitive damages for which a drunk driver may be liable. The Court noted that "[o]nly the conduct of the intoxicated driver of the motor vehicle" was targeted; the Court further observed that "[p]ersons who contribute to the intoxication of the driver, including a bar owner, store proprietor, and/or passenger who supply the driver with alcohol" are "not directly targeted by Article 2315.4" and "cannot be bound by Article 2324 to shoulder the punitive damages responsibility." Ross, 02-0299, pp. 6 and 7, 828 So.2d at 554. This analogy was part of the basis for the Ross holding that parties who had no physical possession or control of a hazardous substance are not liable for punitive damages under Article 2315.3.
I am unable to discern how the majority can find comfort in Ross.

Distinction Between Ross and the Instant Case
In Ross, the plaintiffs asserted, among other theories, that the non-employer defendants who never had physical contact with the hazardous and toxic substance were liable to them for the punitive damages provided for in Article 2315.3 pursuant to the provisions of La. C.C. art. 2324A which provides that "[h]e who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act." (Emphasis added.)[2] The majority correctly observe that this theory was not asserted by the plaintiffs in the instant case. In particular, the majority state the following in their per curiam.
The fact situations in Ross are significantly different from those of the instant case. There are no allegations of conspiracy in this case, only allegations of actual and/or an assumed duty of storage, handling, or transportation of a hazardous substance pursuant to Civil Code Art. 2315.3 (Emphasis added.)
Implicit in this statement is that this factual distinction (no allegations of conspiracy) permits the majority to refuse to follow the jurisprudence established in Ross.
For the reasons that follow, it is my opinion that this distinction is not relevant to the issue of liability for punitive damages. The majority fell into legal error by considering this distinction to justify the result they reach on the punitive damages liability issue.
In Ross, 02-0299, pp. 5, 6 and 7, 828 So.2d at 552, 553 and 554, appears the following: (1) "the language of Article 2324 that co-conspirators are answerable in solido `for the damage caused by such act' indicates that the Article imposes solidary *999 liability only for compensatory damages."; (2) "[c]onsequently, we conclude that the solidarity imposed by Article 2324 cannot be used to assess punitive damages against a party based on the acts of co-conspirators. To be subject to punitive damages, each co-conspirator's individual conduct must fall within the scope of the applicable penal statute."; and (3) "[t]herefore, even assuming that plaintiffs can successfully prove the existence of a conspiracy among the employer and non-employer defendants to harm or commit a battery upon Ross and Landon by misrepresentation and failure to warn of the hazards of vinyl chloride, we conclude that non-employer defendants who have never had physical contact with the vinyl chloride at issue cannot be assessed punitive damages under former Article 2315.3 based on the acts of storage, handling, or transportation by alleged co-conspirators. The civil conspiracy set forth in Article 2324, when sufficiently proven, authorizes the award of compensatory damages only." (Emphasis added.)
The above quoted language from Ross makes it crystal clear that this distinction asserted by the majority in the instant case is a distinction "without a difference", is a distinction that is not relevant to determining ALSA's liability for punitive damages and is a distinction that does not justify violating Ross.[3]

Conclusion
For the foregoing reasons, I respectfully concur in part and dissent in part.
NOTES
[1] Judge Walter I. Lanier, Jr., retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Although the plaintiffs filed suit against several defendants, in the first trial (Perkins I) they proceeded against only Entergy Services, Inc., Gulf States Utilities Company, and Louisiana Power and Light, Inc. (collectively, "Entergy"). The Louisiana Supreme Court affirmed this court's decision, which reversed the trial court judgment in plaintiffs' favor. Perkins v. Entergy Corporation, 98-2081, 98-2082, 98-2083 (La.App. 1 Cir. 12/28/99), 756 So.2d 388, aff'd, XXXX-XXXX, XXXX-XXXX, XXXX-XXXX (La.3/23/2001), 782 So.2d 606 (the electrical outage was not a cause-in-fact of the plaintiffs' injuries).
[3] This corporation is identified in the X.L. and National Union insurance policies by its French name, "L'Air Liquide, Societe Anonyme pour L'Etude et L'Explotation des Procedes Georges Claude." It is not to be confused with another corporation, Air Liquide International, S.A., which is an additional named insured in both policies.
[4] On June 22, 1999, the trial court rendered judgments in plaintiffs' favor. The trial court attached the interrogatories returned by the jury, making that document a part of the judgments. On August 9, 1999, the trial court amended the June 22, 1999 judgments, adjusting the compensatory damages awards made to the Perkins plaintiffs and the Hracek plaintiffs pursuant to a partial granting of the defendants' motion for judgment notwithstanding the verdict. All judgments are before us on appeal.
[5] For a more detailed description of the accident, see Perkins v. Entergy Corporation, 98-2081, 98-2082, 98-2083 (La.App. 1 Cir. 12/28/99), 756 So.2d 388.
[6] The plaintiffs entered into a stipulation, the particulars of which are in dispute, that proportionately allocated the exemplary damages award to the plaintiffs based on the amount of compensatory damages awarded.
[7] For a discussion of the various approaches or formula used to evaluate negligence, see Perkins, 98-2081, 98-2082, 98-2083 at pp. 20-21, 756 So.2d at pp. 402-403.
[8] As stated in Joiner, 966 F.Supp. at 1489, no case has imposed upon a parent corporation a duty to control the acts of its subsidiaries. See also, Fletcher v. Atex, Inc., 861 F.Supp. 242, 247 (S.D.N.Y.1994), order aff'd, 68 F.3d 1451 (2nd Cir.1995), (absent a special relationship between the parent and the subsidiary there is no duty to control the subsidiary's conduct to prevent harm to third persons). The plaintiffs did not cite, and our research failed to uncover, any case in which a parent has been held liable on the basis of a duty to control a subsidiary.
[9] The jury answered "Yes" to the interrogatory "Do you find that [ALSA] assumed a duty for safety at ALAC's Plaquemine Air Separation Plant?"
[10] The word "protect" apparently is a typographical error and should be "perform." See Hill v. United States Fidelity and Guaranty Company, 428 F.2d 112, 115 n. 5 (5th Cir. 1970).
[11] Moore v. Safeway, Inc., 95-1552 (La.App. 1 Cir. 11/22/96), 700 So.2d 831, writs denied, 97-2921, 97-3000 (La.2/6/98), 709 So.2d 735, 744.
[12] Barnes v. Bott, 571 So.2d 183 (La.App. 4 Cir.1990), writ denied, 573 So.2d 1141 (La. 1991).
[13] Carlin v. Rapides Parish Police Jury, 584 So.2d 337 (La.App. 3 Cir.1991).
[14] Dartlone v. Louisiana Power & Light Company, 33597 (La.App. 2 Cir. 6/21/00), 763 So.2d 779.
[15] Bristol-Myers was the parent corporation and sole stockholder of the Medical Engineering Corporation (MEC), which employed Miller. Miller was working in MEC's newly constructed material preparation room pouring toluene, a flammable chemical. A static spark apparently caused the toluene to ignite resulting in the fire that injured her. Frank B. Hall, Inc. was an insurance broker that not only sold insurance, but also provided advisory services to its clients concerning loss control and safety. Bristol-Myers purchased insurance for itself and its subsidiaries from Hall. Two years prior to the fire, Hall's representative visited MEC and recommended the construction of a new material preparation room; the recommendation was forwarded to Bristol-Myers' Insurance and Safety Department. The recommendations included that the new room be located along an outside wall, cut off from other operations by a fire wall; and that sprinklers, adequate ventilation, drainage, explosion resistant electrical equipment, and multiple exits be provided. A later recommendation was for: proper "gowning" of employees in low-particulate cotton in lieu of nylon gowns because of static buildup and because nylon is flammable; and for grounding mats or bonding wires on the floors. Miller claimed the lack of proper gowning and mats caused the fire that injured her.
[16] The "Direction Technique" is the "Technical Department" of ALSA.
[17] On appeal, X.L. argues it was reversible error for the trial court to admit "European safety guidelines as standards of conduct in Louisiana." This argument is without merit because ALSA's own document, TI84, was the relevant standard introduced into evidence. ALSA's insurer cannot repudiate its own insured's standards.
[18] A related issue is raised by X.L. in its brief: whether the immunity from tort liability granted to corporate stockholders by Louisiana Workers' Compensation Law, La. R.S. 23:1032, extends to ALSA. This issue is disposed of by the fact that ALSA is not a stockholder of ALAC, but its "great-great-grandparent."
[19] This provision was repealed by 1996 La. Acts, 1st Ex.Sess., No. 2 § 1, effective April 16, 1996. However, the act provided that the repeal was to be applied only to causes of action that arise on or after the effective date of the act. Therefore, the provision is still applicable to this cause of action, which arose in 1994.
[20] Other issues include whether the plaintiffs' injuries were caused by "wanton or reckless disregard for public safety" and whether the substance involved was "hazardous or toxic." La. Civ.Code art. 2315.3. The penal nature of the provision mandates strict construction and point-by-point evaluation.
[21] This court notes that the Jordan case dealt with a maritime claim and is controlled by maritime law. In maritime law, punitive damages do not bear interest from date of judicial demand, but from date of rendition of judgmentwhich is distinguishable from our state tort laws and from La. R.S. 13:4203. Also in Jordan, the court relied upon Alexander v. Burrows Corp., 359 So.2d 607, 613-617 (La.1978), a redhibition case dealing with legal interest on attorneys fees as support for that proposition. Though we may disagree with the Jordan case, it is the law of this circuit and we are constrained to follow it.
[22] Another defense witness, Alfred Foelster, who served as national maintenance manager for Airco Industrial Gases, verified that Ms. Heil's testimony concerning "outside the barrier limits" referred to outside the boundaries of ASU # 4.
[23] Significantly, Ms. Heil also testified the construction of ASU # 4 did not affect the amount of oxygen flowing through the automatic control valve at the let-down station and did not have any effect on its operation.
[24] As previously indicated, we also note the flash fire occurred three years after the plant expansion.
[25] In Acts 1996, 1st Ex.Sess., No. 3, Sec. 1, effective April 16, 1996, the legislature amended Article 2323 to expressly provide that the degree of fault of all persons shall be determined, regardless of the person's immunity by statute, including immunity as provided by La. R.S. 23:1032 of the workers' compensation law.

Additionally, Article 2324(B) was amended at the same time to provide that except for intentional or willful acts, liability for damages caused by two or more persons shall be a joint and divisible obligation. The amended paragraph further provides that a joint tortfeasor shall not be liable for more than his degree of fault and shall not be solidarily liable with any other person for damages attributable to the fault of such other person, regardless of such other person's immunity by statute, including immunity as provided in La. R.S. 23:1032.
[26] Gauthier was overruled in Cavalier v. Cain's Hydrostatic Testing, Inc., 94-1496, p. 9 (La.6/30/95), 657 So.2d 975, 981. For a discussion of the jurisprudence concerning the quantification of employer fault in third-party tort actions, pursuant to La.Code Civ. P. art. 1812(C) and La. Civ.Code art. 2324(B), see Fleniken, XXXX-XXXX at pp. 23-26, 780 So.2d at 1192-1193.
[27] Because we have determined LAEC is not liable, we need not address the defendants' arguments concerning exclusions pertaining to that corporation.
[28] In its brief to this court, X.L. admits:

X.L. recognizes that coverage provided in an occurrence policy vests the injured party with direct action rights by the happening of the occurrence, not by the giving of notice. For legitimate reasons of public policy, as expressed in West v. Monroe Bakery, Inc., [217 La. 189, 46 So.2d 122 (1950)] and its progeny, those rights may not be divested by the breach of a policy condition requiring prompt notice, when the delay is due to the fault of the insured, over whom injured persons have no control.
Nevertheless, X.L. asserts the vesting rationale of West does not apply to its occurrence-reported policy.
[29] A claims-made-and-reported requirement appears to be appropriate in a professional liability policy, but it is not necessary in a situation such as is presented in the instant case, there being no question of the date of the accident. ALSA, as the parent corporation, had immediate knowledge of the accident at its subsidiary.
[30] This corporation is not to be confused with the ALAC that owned the Plaquemine plant on the date of the accident.
[31] Compare CBM Engineers, Inc. v. Transcontinental Insurance Company, 460 So.2d 745, 747, (La.App. 3 Cir.1984) and Gregoire v. AFB Construction, Inc., 478 So.2d 538, 541 (La. App. 1 Cir.1985) (engineering firm's breach of its duty to warn of unsafe conditions not necessarily within the professional or supervisory services it contracted to provide.)
[32] "Professional services," in its usual connotation, means services performed by one in the ordinary course of the practice of a profession, on behalf of another, pursuant to some agreement, express or implied, and for which it could reasonably be expected some compensation would be due. Aker v. Sabatier, 200 So.2d 94, 97 (La.App. 1 Cir.), writs denied, 251 La. 48,49, 202 So.2d 657, 658 (La. 1967).
[33] This case was identified as Grant v. Touro Infirmary and overruled on other grounds in Garlington v. Kingsley, 289 So.2d 88, 93 (La. 1974) (charitable immunity doctrine repudiated).
[34] The primary objective of general damages is to restore the party in as near a fashion as possible to the state he was in at the time immediately preceding injury. Daigle, 94-0304 at p. 7, 655 So.2d at 437.
[35] Reflecting on these injuries, we reiterate our comments from Perkins I:

Because of the horrible injuries suffered by the plaintiffs, we have struggled mightily with the issues presented in this matter. It was impossible not to be emotionally moved when reading the testimony of the plaintiffs and the testimony of their family members, co-workers, and physicians. However, as we instruct juries, our decision must be made, not based on sympathy, but based on the facts and law.
Perkins, 98-2081, 98-2082, 98-2083 at p. 35, 756 So.2d at 413.
[36] Because X.L. and National Union do not challenge the amounts awarded to the Hracek plaintiffs pursuant to the JNOV, we need not consider whether the awards are in excess of the highest amount within the court's discretion.
[1] A noun is defined as "[a] word that is used to name a person, place, thing, quality, or action and can function as the subject or object of a verb, the object of a preposition, or an appositive." (Emphasis added.) Webster's II New College Dictionary, supra at 749.
[2] A verb is defined as "[t]he part of speech that expresses action, existence, or occurrence in most languages." (Emphasis added.) Webster's II New College Dictionary, supra at 1225.
[3] The word person is used herein as it is defined in La. C.C. art. 24: either a natural or a juridical person. See also La. C.C. art. 3430.
[4] The presumptions in La. C.C. arts. 3427 and 3432 must be construed with La. C.E. arts. 302(3) and 305.
[5] Title 14 of the Revised Statutes provides for the Louisiana Criminal Code, and the laws therein are obviously penal in nature. However, Title 14 statutes (laws) are not subject to the strict construction rule; they are subject to a "genuine construction" rule. La. R.S. 14:3 entitled "Interpretation" provides as follows:

The articles of this Code cannot be extended by analogy so as to create crimes not provided for herein; however, in order to promote justice and to effect the objects of the law, all of its provisions shall be given a genuine construction, according to the fair import of their words, taken in their usual sense, in connection with the context, and with reference to the purpose of the provision. (Emphasis added.)
[6] This was the law in effect in 1994. La. C.C. art. 2985 et seq. were revised by Acts 1997, No. 261, § 1, effective January 1, 1998. See La. C.C. art. 2989 et seq.
[7] Revision Comment (c) for Article 3431 provides, in pertinent part, that "[c]ivil possession is the retention of the possession of a thing merely by virtue of the intent to own it as ... when a person ceases to exercise physical control over a movable without intending to abandon possession."
[1] Even if ALSA owned stock in ALAC, it would not be liable for the torts of ALAC solely on the basis of stock ownership. La. R.S. 12:93.
[2] Article 2324 is entitled "Liability as solidary or joint and divisible obligation".
[3] It must be noted that the last section of the Ross opinion is entitled "Liability of each co-conspirator under art. 2315.3 based on individual actions." (Emphasis added.)